26 CV 825

Revised 03/06 WDNY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**



FILED
APR 2 3 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

## FORM TO BE USED IN FILING A CIVIL COMPLAINT IN FEDERAL COURT
### (Non-Prisoner Context)

All material filed in this Court is now available via the **INTERNET**. See **Pro Se Privacy Notice** for further information.

### 1. CAPTION OF ACTION

A.    **Full Name of Plaintiff: NOTE**: *If more than one plaintiff files this action and seeks in forma pauperis status, **each** plaintiff must submit an in forma pauperis application or the only plaintiff to be considered will be the plaintiff who filed an application.*

Please See Attached.

-vs-

B.    **Full Name(s) of Defendant(s) NOTE:** *Pursuant to Fed.R.Civ.P. 10(a), the names of all parties must appear in the caption. The court may not consider a claim against anyone not identified in this section as a defendant.* Add a separate sheet, if necessary.

1. _____    4. _____
2. _____    5. _____
3. _____    6. _____

### 2. STATEMENT OF JURISDICTION, VENUE and NATURE OF SUIT
*All of these sections **MUST** be answered*

*Identify the basis for federal Court jurisdiction over your claim, such as that the United States government is a party to the action, all the parties reside in different states and therefore you claim diversity jurisdiction, or the claim presents a federal question or arises under federal law.*

A. Basis of Jurisdiction in Federal Court: Please See attached

*State why the Western District of New York is the proper venue for this action, such as that your claim arises in or the defendant resides in the 17 westernmost counties of New York State.*

B. Reason for Venue in the Western District: Please see attached

*Identify the nature of this action, such as that it is a civil rights claim, a personal injury or personal property (tort) claim, a property rights claim, or whatever it is.*

C. Nature of Suit: 42 USC 1983

## 3. PARTIES TO THIS ACTION

**PLAINTIFF'S INFORMATION  NOTE:** *To list additional plaintiffs, use this format on another sheet of paper.*

Name of First Plaintiff:_____

Present Address:_____

_____

Name of Second Plaintiff:_____

Present Address:_____

_____

**DEFENDANT'S INFORMATION  NOTE:** *To list additional defendants, use this format on another sheet of paper.*

Name of First Defendant:_____

Official Position of Defendant (if relevant):_____

Address of Defendant:_____

_____

Name of Second Defendant:_____

Official Position of Defendant (if relevant):_____

Address of Defendant:_____

_____

Name of Third Defendant:_____

Official Position of Defendant (if relevant):_____

Address of Defendant:_____

_____

*please see attached*

## 4. PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

A.    Have you begun any other lawsuits in **state or federal court** dealing with **the same facts involved in this action?**
Yes ☑   No ☐

If Yes, complete the next section. NOTE: *If you have brought more than one lawsuit dealing with the same facts as this action, use this format to describe the other action(s) on another sheet of paper.*

1.    Name(s) of the parties to this other lawsuit:

Plaintiff(s):___1:18-CV-1152, 1:21-CV-00606_____

_____

Defendant(s):_____

_____

2.  Court (if federal court, name the district; if state court, name the county):_____

_____

3.  Docket or Index Number:_____

4.  Name of Judge to whom case was assigned:_____

5.  The approximate date the action was filed:_____

6.  What was the disposition of the case?

Is it still pending?  Yes ☐  No ☐

If not, give the approximate date it was resolved._____

Disposition (check those statements which apply):

☐ Dismissed (check the statement which indicates why it was dismissed):

☐ By court *sua sponte* as frivolous, malicious or for failing to state a claim upon which relief can be granted;

☐ By court for failure to prosecute, pay filing fee or otherwise respond to a court order;

☐ By court due to your voluntary withdrawal of claim;

☐ Judgment upon motion or after trial entered for

☐ plaintiff

☐ defendant.

## 5. STATEMENT OF CLAIM

**Please note** that it is not enough to just list the ground(s) for your action.  You **must** include a statement of the facts which you believe support each of your claims.  In other words, just tell the story of what happened and do not use legal jargon.

**Fed.R.Civ.P. 8(a)** states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "The function of pleadings under the Federal Rules is to give fair notice of the claim asserted.  Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial."  Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995).

**Fed.R.Civ.P. 10(b)** states that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far a practicable to a single set of circumstances."

**A. FIRST CLAIM:**  On (*date of the incident*) _____,

defendant (*give the **name and (if relevant) the position held** of **each defendant** involved in this incident*) _____

_____

_____

3

did the following to me (*briefly state what each defendant named above did*): _____

_____

_____

_____

_____

_____

_____

The federal basis for this claim is: _____

_____

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes*:

_____

_____

_____

**B. SECOND CLAIM:** On (*date of the incident*) _____,
defendant (*give the name and (if relevant) position held of each defendant involved in this incident*) _____

_____

_____

did the following to me (*briefly state what each defendant named above did*): _____

_____

_____

_____

_____

_____

The federal basis for this claim is: _____

_____

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes*:

_____

_____

**If you have additional claims, use the above format to set them out on additional sheets of paper.**

## 6. SUMMARY OF RELIEF SOUGHT

*Summarize the relief requested by you in each statement of claim above.*

_____

_____

_____

_____

_____

Do you want a **jury trial**?  Yes ☑  No ☐

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on  *04/20/26*
             (date)

**NOTE:** *Each plaintiff must sign this complaint and must also sign all subsequent papers filed with the Court.*

_____

_____

Signature(s) of Plaintiff(s)

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------

LAWTORYA JOHNSON and VICTOR JOHNSON,

Plaintiffs,

**COMPLAINT AND JURY**
**DEMAND**

-v-

Trooper Slawek, Trooper Curran III, LIEUTENANT JOHN DOE
(New York State Police Supervisor), JOHN and
JANE DOE OFFICERS 1–20 (Niagara Falls Police Officers),
and CITY OF NIAGARA FALLS,

Defendants.

--------------------------------------------------------------------------

*Plaintiffs, by and through themselves, allege as follows:*


## I. NATURE OF THE ACTION

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.


## II. JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper in this district because all events occurred in Niagara Falls, New York.

## III. PARTIES

4.      Plaintiff *Victor Johnson* resides in Niagara Falls, New York.

5.      Plaintiff *Lawtorya Johnson* resides in Niagara Falls, New York.

6.      Defendant Trooper Slawek was at all relevant times a member of the New

York State Police acting under color of state law.

7. Defendant Trooper Curran III was at all relevant times a member of the New York State Police acting under color of state law.

8. Defendant Lieutenant John Doe was a supervising officer of the New York State Police.

9. Defendants John and Jane Doe Officers 1–20 were officers of the Niagara Falls Police Department.

10. Defendant City of Niagara Falls is a municipal entity responsible for policies, training, and supervision of its police officers.

## IV. FACTUAL ALLEGATIONS

11. On August 8, 2024, Plaintiffs were traveling lawfully in Niagara Falls, New York.

12. Defendants Trooper Slawek and Trooper Curran III made a sudden U-turn and began following Plaintiffs without reasonable suspicion or probable cause.

13. Plaintiffs arrived at their residence on Fairfield Avenue.

14. Defendants initiated a traffic stop alleging a seatbelt violation.

15. Video evidence shows both Plaintiffs were wearing seatbelts.

16. Multiple police units responded and escalated the encounter into a felony stop, including surrounding Plaintiffs and deploying tire deflation devices.

17. Plaintiffs were compliant and posed no threat.

18. Plaintiff Victor Johnson was forcibly removed, thrown against a vehicle, and his shoulder was twisted, causing injury.

19. Defendants conducted a warrantless search of the vehicle without consent or probable cause.

20. Plaintiffs were arrested and charged with criminal offenses, including obstruction.

21. Plaintiff Victor Johnson sought medical treatment following the incident.

22. All charges were dismissed with prejudice on February 4, 2025.

23. The officers refused to testify in the criminal proceeding.

24. Defendants acted without probable cause and with reckless disregard for Plaintiffs' rights.

25. Plaintiffs were subjected to discriminatory and racially motivated enforcement.

## V. **CLAIMS FOR RELIEF**

### COUNT I – **FALSE ARREST (Fourth Amendment)**

26. Defendants arrested Plaintiffs without probable cause in violation of clearly established law.

### COUNT II – **EXCESSIVE FORCE (Fourth Amendment)**

27. Defendants used objectively unreasonable force against Plaintiff Victor Johnson.

### COUNT III – **UNLAWFUL STOP AND SEIZURE**

28. The stop of Plaintiffs' vehicle lacked reasonable suspicion or lawful justification.

### COUNT IV – **ILLEGAL SEARCH**

29. Defendants conducted a warrantless search without consent or probable cause.

### COUNT V – **MALICIOUS PROSECUTION**

30. Defendants initiated criminal proceedings without probable cause.

31. The proceedings terminated in Plaintiffs' favor.

## COUNT VI – **EQUAL PROTECTION (Fourteenth Amendment)**

32.    Plaintiffs were selectively targeted and treated differently based on race.

## COUNT VII – **FAILURE TO INTERVENE**

33.    Defendants failed to prevent the constitutional violations of fellow officers.

## COUNT VIII – **MUNICIPAL LIABILITY (Monell)**

34.    The City of Niagara Falls maintained policies, customs, or practices that caused the violations.

## COUNT IX – **SUPERVISORY LIABILITY**

35.    Defendant Lieutenant John Doe failed to supervise and control subordinate officers.

## VI. **DAMAGES**

36.    Plaintiffs suffered:

      Physical injury

      Emotional distress

      Loss of liberty

37.    Plaintiffs seek:

      Compensatory damages

      Punitive damages

      Costs and attorney's fees

## VII. **JURY DEMAND**

38.    Plaintiffs demand a trial by jury.

## VIII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request judgment against Defendants for damages and all further relief deemed just and proper.

Dated: 04/20/2026

Victor Johnson (Plaintiff Pro Se)

Lawtorya Johnson (Plaintiff Pro Se)

VICTOR JOHNSON

STATE OF NEW YORK
SUPREME COURT : COUNTY OF NIAGARA

---------------------------------------------------

VICTOR E. JOHNSON, SR.,

Claimant,

-vs-

CITY OF NIAGARA FALLS,

Respondent.

---------------------------------------------------

Examination Under Oath of

VICTOR JOHNSON, Claimant, taken pursuant to Notice under

Section 50-h of the General Municipal Law, at NIAGARA FALLS

CITY HALL, 745 Main Street, Niagara Falls, New York, taken

on April 29, 2025, commencing at 10:16 A.M., before

CHRISTINA S. VEGUILLA, Notary Public.

---

2

INDEX TO EXHIBITS

| Exhibits | | For Identification |
|---|---|---|
| 1 | Notice of Claim | 4 |
| 2 | Video from Phone | 24 |
| 3 | Digital Photo | 25 |
| 4 | Ring Video | 25 |
| 5 | In-Car Video | 28 |
| 6 | Digital Photo | 34 |
| 7 | Still Photo | 46 |
| 8 | Ring Video | 61 |
| 9 | Ring Video | 63 |

---

3

INDEX TO DOCUMENT REQUESTS

| Page, Line | | Description |
|---|---|---|
| 45 | 10 | All photos and videos of incident |
| 46 | 17 | Photos of injuries |

---

4

APPEARANCES:

WALSH, ROBERTS & GRACE, LLP,
By KEITH N. BOND, ESQ.,
400 Rand Building,
14 Lafayette Square,
Buffalo, New York 14203,
Appearing for the Respondent.

(Whereupon, a Notice of Claim was then received and marked as Exhibit 1, for identification.)

V I C T O R   J O H N S O N,
924 Fairfield Avenue, Niagara Falls, New York 14305, after being duly called and sworn, testified as follows:

EXAMINATION BY MR. BOND:

Q. Good morning, Mr. Johnson. I introduced myself before. My name is Keith Bond, I'm an attorney representing the City of Niagara Falls. We're here this morning to conduct what's known as a 50-h examination under oath.

**5**

I'll just outline for you the procedure here this morning. I'm going to be asking you some questions. Please let me finish my question before you answer so the stenographer can take down both the question and answer. Okay?

A. Yes.

Q. Make sure you answer out loud, which you did. So you are off to a good start. And if there's any question that I ask you that you don't understand, just let me know and I'll try and clarify it for you. All right?

A. Okay.

Q. Okay. First let me show you what's been marked as Exhibit 1, which is a Notice of Claim regarding notice of intent dated March 1st, 2025. It's a three-page document.

A. Yes, I'm aware of it. I filed this, yes.

Q. Yes. Just for the record, is this a copy of the document that you filed?

A. Yes.

Q. All right. And it has your signature at the end?

A. Yes.

Q. All right. And this is the document that you

**6**

filed regarding an incident that occurred on August 2nd of 2024?

A. Yes.

Q. Okay. And the Notice of Claim alleges misconduct by the New York State Police and some Niagara Falls police officers, correct?

A. Right.

Q. All right. And just so I'm clear, was this Notice of Claim served on behalf of you and your daughter?

A. Yes.

Q. And your daughter's name is Lawtorya?

A. Lawtorya.

Q. Lawtorya. And how old is she?

A. Twenty, I believe.

Q. Okay. And does she reside with you?

A. No. She lives -- she's a college student. She goes to Buff State.

Q. She lives on campus?

A. Yes.

Q. Okay. So the notice that was sent out requested that you and your daughter appear this morning. Did you discuss with her the hearing scheduled

**7**

for this morning?

A. Yes. I guess she got some kind of class or something.

Q. Okay.

A. If you could reschedule that for her.

Q. Okay. All right. And so to try and reschedule that, would I send the notice to your home address or would I send it somewhere else?

A. No, you can send it to me.

Q. Okay. All right. So can you tell me, were you living at the Fairfield Avenue address back in August of 2024?

A. Yes.

Q. Were you born and raised in Niagara Falls?

A. Yes.

Q. What's your educational background?

A. I got some college.

Q. All right. Did you graduate from high school?

A. Yes. I got a GED.

Q. Oh, okay. And where did you go to college?

A. Bryant and Stratton.

Q. But no degree?

A. No.

**8**

Q. All right. Have you ever served in the military?

A. No.

Q. Have you ever declared bankruptcy?

A. No.

Q. Have you ever been convicted of a crime?

A. Yes.

Q. What crimes?

A. I'm on parole right now for grand larceny.

Q. So you've got a pending charge for grand larceny?

A. No, no charges. I'm on parole for grand larceny.

Q. Oh, I'm sorry. All right. And any other convictions besides the grand larceny?

A. Some older convictions, so --

Q. All right. Misdemeanors, felonies, both?

A. Yeah. Um-hum.

Q. Both?

A. Yes.

Q. Okay. And how long were you on parole for?

A. Well, I've been out for a year. So it was five years, but I only got like three left.

Q. Okay. All right. So when were you released from custody and placed on parole?

A. April 17th, 2024.

9

Q. Okay. So this incident happened a few months later?

A. Yes.

Q. All right. And who do you reside with at that Fairfield address?

A. My wife and two children.

Q. What's your wife's name?

A. Linda Johnson.

Q. And what children reside there with you?

A. My daughter, she's eight. And my son, he's six.

Q. Okay. Does Linda work outside the home?

A. She work at Niagara Falls Memorial Medical Center.

Q. What does she do there?

A. She's a nurse assistant.

Q. All right. And since you were released in April of 2024, have you had any employment?

A. No.

Q. All right. And back in August of 2024, was your daughter, Lawtorya -- I'm sorry. I'm going to mispronounce it.

A. Lawtorya.

Q. Lawtorya residing with you?

10

A. No.

Q. Okay. Where did she reside back then?

A. On campus.

Q. All right. So the incident that you filed the Notice of Claim about, do you recall what day of the week it was on?

A. I'm not sure. It could have been a Wednesday or something. I'm not sure.

Q. Okay. And can you tell me where you were headed at the time?

A. Home.

Q. Where were you coming from?

A. The family restaurant Geno's Good Eats, 742 19th Street.

Q. And who was in the car -- you were in a car?

A. Yes.

Q. Who was in the car with you?

A. I was a passenger in the car. My daughter was driving.

Q. All right. And that's Lawtorya?

A. Yes.

Q. What kind of vehicle was it?

A. A Buick Rendezvous.

11

Q. And who owned the vehicle?

A. My wife.

Q. At some point in time was the vehicle you were a passenger in pulled over?

A. Yes.

Q. Who pulled it over?

A. The state police.

Q. And where did they pull it over?

A. At 924 Fairfield.

Q. So in front of your home?

A. Yes.

Q. And how did they pull you over?

A. Well, we was coming up 11th Street and Ontario. We was actually at the light at 11th and Ontario and we were proceeding I want to say -- where would that be? Northbound towards Fairfield over the bridge, Highland Avenue. And the state police was on the opposite side going in the opposite direction towards Niagara Avenue. And seeing that my daughter was in the car, they busted a U-turn and got behind us.

Q. Okay.

A. And they followed us to Fairfield and then put

12

the lights on.

Q. All right. So at some point your daughter turned onto Fairfield?

A. Yes.

Q. All right. And when she turned onto Fairfield, how far down did she travel to get to your home?

A. A block.

Q. Okay. And when the state police pulled the U-turn, did they catch up with you guys before you made the turn onto Fairfield?

A. No. They caught up with us on Fairfield going towards the house.

Q. And before the turn onto Fairfield, did you notice whether they had activated their lights or siren?

A. Not at that point.

Q. Okay. When they turned onto Fairfield, they would have been behind you, I take it?

A. Yes.

Q. All right. If you know, when they turned onto Fairfield, were the state police -- did the vehicle have its siren on or overhead lights?

A. No, not at the time. They instituted that on

13

Fairfield.

Q. Okay. And was it a marked state --

A. Yes.

Q. -- trooper car?

All right. So what, if anything, did your daughter do in response to the police activating their lights and siren?

A. She pulled over in front of 924 Fairfield.

Q. Okay. Did they have their siren on or just the overhead lights?

A. I want to say just the overhead lights. It might have been the siren. I'm not sure. You'll have to look at the video. I'm not sure.

Q. All right. And so was it a situation where when they activated the lights, in effect, your daughter was already in front of your house?

A. Not quite. Maybe a couple houses.

Q. Okay. As far as you know, separate from any police vehicles or police officers involved, did anyone videotape any portion of the interaction?

A. Yes, there's a lot of video footage on this. Yes.

Q. All right. So who do you know that videotaped

14

it?

A. Well, a couple of residents that's on Fairfield got it on video.

Q. Okay.

A. The body camera video, the dash camera video and my Ring camera from the house was on video. All that was submitted to the courts.

Q. Okay. Do you still have copies of the Ring camera video?

A. Yes.

Q. And do you still have copies of the video provided by other residents?

A. I'm not sure. I'll have to ask my wife that. She's in touch with those people.

Q. Okay. All right. So were you a front seat passenger?

A. Front seat passenger.

Q. All right. So once your daughter pulled over in front of your house on Fairfield, what happened?

A. The state police, I guess they called for backup. I guess a bunch of Niagara Falls police officers responded. Niagara Falls police officers put spike strips in front of the vehicle tires. A

15

state trooper asked her for her driver's license, registration or whatever.

Q. Now, let me stop you there. Your daughter pulls over in front of your home. There's a single state trooper vehicle at this point?

A. Yes.

Q. All right. And where does the state trooper vehicle stop?

A. In front of my house. He's in back of us.

Q. Okay. Directly behind you?

A. Yes.

Q. All right. And how many state troopers were in the vehicle?

A. Two.

Q. And how long were they stopped behind you before they exited the vehicle?

A. A minute.

Q. Okay. Did they exit the vehicle before any other police vehicle showed up?

A. Yes.

Q. And the two troopers that exited the vehicle, male, female?

A. Two males.

16

Q. Okay. Caucasian?

A. Yes.

Q. In uniform?

A. Yes.

Q. And does one of the troopers approach your daughter on the driver's side of the vehicle?

A. Yes.

Q. Okay. What does the other trooper do?

A. Approach my side of the vehicle.

Q. Okay. And did you overhear any conversation between the trooper on your daughter's side of the vehicle and her?

A. Yes.

Q. And what was that conversation?

A. He asked for her license and registration.

Q. And did she produce that?

A. Yes.

Q. Where was the registration?

A. In the glove compartment.

Q. Okay. At that point, did you have any conversation with the trooper on your side of the vehicle?

A. Yes. He asked me for my identification.

17

Q. At the time that you were stopped, did you have your window down on your side of the car?

A. Yes.

Q. Okay. And your daughter had her window down?

A. Yes.

Q. Okay. Did you ever learn the names of the troopers involved?

A. Yes.

Q. What were their names? Is it Slawek, S-L-A-W-E-K?

A. Right.

Q. Do you know, was he the trooper on your daughter's side of the car or your side?

A. He was the trooper on my daughter's side of the vehicle.

Q. Okay. And do you happen to know the name of the trooper who approached your side of the vehicle?

A. Curran the Third. I don't know his first name.

Q. Sorry. What was it?

A. Trooper Curran the Third.

Q. All right. So Trooper Curran asked you for some identification?

A. Yes.

18

Q. And what was your response?

A. I didn't provide him no -- I told him I wasn't giving him no identification. I didn't have to identify myself, I was a passenger.

Q. What was his response, if anything?

A. He said that I had to do it.

Q. And what happened then?

A. They called for backup.

Q. All right. Which one called for backup?

A. Trooper -- I'm not sure. One of the troopers called for backup.

Q. Did they have to go back to their car to call for backup?

A. No.

Q. All right. So you were able to hear him call for backup?

A. Yes.

Q. All right. And there was some radio of some sort?

A. Yes.

Q. Do you remember what was said?

A. I don't remember exactly what was said. I just know that a bunch of police responded.

19

Q. Okay. And while you're having this conversation with Trooper Curran, your daughter turned over her license and registration?

A. Yes.

Q. Did you hear any further conversation between Trooper Slawek and your daughter?

A. No, because at that point Niagara Falls police officers showed up and they was talking to my daughter.

Q. Okay. When the Niagara Falls Police Department showed up, were you and your daughter still in the vehicle?

A. Yes.

Q. So how long after you had been stopped was it when the Niagara Falls Police Department showed up?

A. Five minutes.

Q. At any point before backup was called, were you instructed to exit the vehicle?

A. Not at that point. Well, the Niagara Falls police was telling me that I needed to show some identification and it was against the law for me not to do it. And the two Niagara Falls police

20

officers that was on the driver's side talking to me through the window, telling me that I needed to give my identification because it was against the law and I was going to be arrested.

Q. Okay. All right. So how many Niagara Falls Police Department vehicles responded?

A. Three.

Q. Okay. Did you recognize any of the officers in the vehicles?

A. I don't know them.

Q. All right. Was there more than one officer in each vehicle?

A. I'm not sure.

Q. Okay.

A. There was so many vehicles. I don't know.

Q. All right. Did any other state police vehicles arrive?

A. Yes.

Q. How many?

A. Two.

Q. And which -- what was the first additional vehicle to arrive, was it a state police vehicle or a Niagara Falls?

21

A. Niagara Falls.

Q. Okay. And where did the two state police vehicles locate themselves?

A. In the back.

Q. Parked behind?

A. Yes.

Q. What about the three Niagara Falls vehicles?

A. They was on the opposite side of the street.

Q. Okay. None of the vehicles were pulled in front of your car?

A. I'm not sure. Because at some point they put the spike strips in front of the tires, so I'm not sure.

Q. All right. Where were you when the spike strips were put in front of the tires?

A. In the passenger's seat.

Q. Okay. Where was your daughter?

A. In the driver's seat.

Q. Once the two state troopers approached the vehicle, did they remain standing by the driver's side window and your window?

A. Well, one was on one side and the other one was on the other side. One was on the driver's side,

22

one was on the passenger's side.

Q. And did they stay in that area?

A. Yes.

Q. Okay. They didn't go back to their car?

A. No.

Q. All right. And so did you hear any conversation between the troopers and the first set of Niagara Falls officers that arrived?

A. I'm not sure.

Q. Okay. Was it the -- I think you said there were two Niagara Falls police officers speaking to you through the driver's side window?

A. Yes.

Q. Okay. And at that point your daughter was still in the driver's seat?

A. Yes.

Q. All right. And the two officers, were they in uniform?

A. Yes.

Q. Do you recall what they looked like?

A. No. I got the video on my phone.

Q. Okay. So you have video of the encounter that you took on your phone?

23

A. Yes.

Q. Okay. And how long is the video?

A. The video is maybe ten minutes, maybe.

Q. Okay. And during that ten minutes, are you seated in the car the entire time?

A. Yes.

Q. And how does it end up that you leave the vehicle?

A. They told me to exit the vehicle, that I was being under arrest.

Q. Who told you that?

A. The state police and the Niagara Falls police officers.

Q. All right. And so I think you said that there were two Niagara Falls officers who were telling you that you had to provide identification?

A. Yes.

Q. And your response was that you did not have to?

A. Right.

Q. Did they say anything else to explain why you had to provide identification?

A. They said that it was the law.

Q. Okay. Were these two officers that were talking

24

to you through the driver's side window, were they swearing at you at all?

A. Not that I recall.

Q. Okay. Were they using raised voices?

A. Oh, yeah. It got kind of heated.

Q. All right. And when you say it got kind of heated, you mean they were -- were they yelling?

A. Yes.

Q. Okay. And were you or your daughter yelling?

A. I was.

Q. Okay. And what about the state troopers, were they yelling?

A. They was.

Q. All right. And do you remember what was being said by any of the police?

A. Not without really looking at the video.

MR. BOND: Okay. Do you want to take some time to look at it now?

   (Whereupon, a Video from Phone was then received and marked as Exhibit 2, for identification.)

25

THE WITNESS:  Let's see.  So here's the still shot of the vehicles.

MR. BOND:  Okay.

(Whereupon, a Digital Photo was then received and marked as Exhibit 3, for identification.)

BY MR. BOND:

Q.  All right.  This shows three state troopers in the video -- or, I'm sorry.  In the photograph?

A.  Yes.

Q.  Okay.  All right.

A.  So it was actually one, two, three -- four state police cars.  And then it's one, two, three -- four Niagara Falls police officers.

Q.  Okay.

A.  Let me see if I can bring up the video.  I'll bring up the video.

MR. BOND:  Why don't you make a note that he showed me the photo on his phone.

(Whereupon, video footage was then played.)

THE WITNESS:  That's the Niagara Falls police that's

26

talking.  There's more to it.

(Whereupon, a Ring Video was then received and marked as Exhibit 4, for identification.)

(Whereupon, video footage was then played.)

THE WITNESS:  This is the actual arrest when they snatched me out the car.

BY MR. BOND:

Q.  Okay.  So was there --

A.  And when Niagara Falls police snatched my daughter out the car and put her in handcuffs and arrested her.

Q.  All right.  So we just watched a video.  And how did it come about that the recording stopped?  Did you stop recording?

A.  I think at some point -- see, this is from the --

Q.  Ring footage?

A.  Ring footage.

MR. BOND:  So video 4 is from the Ring footage.

(Whereupon, video footage was then played.)

BY MR. BOND:

Q.  Just to be clear, while I'm looking at it, so the

27

Ring footage shows the first vehicle -- shows to the right is the vehicle you and your daughter were in, the SUV, correct?

A.  Right.

Q.  And it looks like the vehicle behind it, is that an unmarked state trooper vehicle?

A.  No, that was a marked state trooper vehicle.

Q.  Okay.  That's a marked state trooper vehicle.  Okay.  And then behind the state trooper vehicle on the other side of the street facing the same direction, there's a Niagara Falls police vehicle?

A.  Yes.  Yes, there's several Niagara Falls police vehicles on that side of the street.

Q.  Okay.  You see sort of in front of the trooper vehicle on the other side of the street facing the opposite direction is a black vehicle?

A.  Right.

Q.  What was that?

A.  Niagara Falls police.

MR. BOND:  Okay.  All right.  And then -- let's see.

(Whereupon, video footage was then played.)

THE WITNESS:  So there's a part two.

28

BY MR. BOND:

Q.  All right.

A.  There's a part two.  That's just the Ring part of it.  There's a part two.

MR. BOND:  So that will be 5.

(Whereupon, an In-Car Video was then received and marked as Exhibit 5, for identification.)

THE WITNESS:  That's part one.  It may be the same thing.  It may run right into each other.

(Whereupon, video footage was then played.)

BY MR. BOND:

Q.  Is that the same video or is it a different one?

A.  No.  It runs into the other half of the video.  It runs into the other half of the video.

(Whereupon, video footage was then played.)

THE WITNESS:  That's the Niagara Falls police arresting my daughter.  Kay Richards was one of the Niagara Falls police officers.  Kay Richards.  I think it's a female cop.

BY MR. BOND:

29

Q. It's back to the beginning?

A. Yes.

Q. All right. So let me ask you, the second video that we just watched, was that taken on the same phone as the first video inside the car?

A. Yes.

Q. All right. And then was there a reason why the video was stopped and then a second recording started?

A. I can't remember at that point.

Q. Okay. And so the second video that we just watched, it looks like the person that was filming was moving the camera to show different things taking place. Was that you or someone else?

A. I was -- at this point I was already in the back of the state trooper police car.

Q. Okay. So do you know who was holding the phone taping, what was going on?

A. I'm not -- I don't remember. There were so many people out there.

Q. Okay. But was it your phone or your daughter's phone that was recording it?

30

A. My phone.

Q. Is that the same phone that you have here today or a different one?

A. Yeah, the same phone.

Q. Okay. So at some point you left the vehicle and someone else picked up your phone and started filming?

A. Yes. My daughter.

Q. All right. Well, then at some point your daughter -- she's wearing a hoodie and wearing glasses. Is that your daughter?

A. Yes.

Q. And she's handcuffed and someone is videotaping what's going on. Do you know who that was?

A. I think that my daughter has the phone in her hand is what I think. I'm pretty sure. I'm --

Q. Has your phone in her hand?

A. Yes, I'm pretty sure.

Q. Okay.

A. She has the phone in her hand.

Q. Well, the reason I ask is -- I thought she was handcuffed with her hands behind her back and there was video footage that was showing her

31

talking.

A. Yeah, but I think she still had the phone in her hand with the handcuffs on. That's why it was kind of upside down.

Q. Was she handcuffed from the front or the back?

A. From the back.

Q. Okay.

A. If you noticed, the Niagara Falls police officer that put her under arrest told her she wasn't free to leave.

Q. Okay. But did he tell her that you weren't going to be arrested, we're just not going to let you push people that are getting arrested?

A. No.

Q. No. Okay. Was she actually charged with something?

A. She was charged with a seat belt violation.

Q. Okay. So she wasn't arrested, she was given a ticket for a seat belt violation?

A. Well, she went to court.

Q. Right. But in other words, she wasn't taken into custody by the police --

A. No.

32

Q. -- like you were that day?

A. No.

Q. Okay. All right. So at some point it looks like a supervisor from the state police shows up?

A. Yeah, I believe so.

Q. And then says since I just got here, tell me what's going on?

A. Right.

Q. Okay. So how does it come about that you get out of the vehicle?

A. They took me out of the vehicle.

Q. All right. So what was the conversation that led to that?

A. They told me I was under arrest.

Q. For what?

A. Obstructing government administration and aggravated unlicensed operation. Obstructing government administration second.

Q. Unlicensed aggravated operation?

A. Yes.

Q. All right. Did you have an outstanding charge of aggravated unlicensed operation?

A. That was the first time I ever been charged with

33

something like that.

Q. Did you have a valid New York State driver's license?

A. I did. My license was suspended.

Q. What was it suspended for?

A. Child support.

Q. All right. So at some point did the troopers advise you that you were being placed under arrest while you were still inside the vehicle?

A. Yes.

Q. Did you voluntarily exit the vehicle?

A. Yes.

Q. All right. And what happened once you exited the vehicle?

A. They forcefully put my hands behind my back, twisted my arms up and put the cuffs on real tight, took me into the -- threw me into the back of the state trooper police car that was directly in back of the car.

Q. Okay. And the officers who cuffed you and put you in the back of the car, were those state police officers?

A. Yes.

34

Q. Okay. Did any Niagara Falls police officers have any physical contact with you at the scene?

A. I don't remember. It was, it was so many police out there. I can't -- I don't know.

Q. Well, who told you you were under arrest, Niagara Falls officers or state police?

A. I think the people -- I think the Niagara Falls police was yelling through the window from the driver's side, telling me that I was being arrested.

Like here's all the Niagara Falls -- here because the Niagara Falls police arrested several other people outside the residence.

MR. BOND: You're showing me another photo. What are we up to, 6?

(Whereupon, a Digital Photo was then received and marked as Exhibit 6, for identification.)

BY MR. BOND:

Q. Exhibit 6, which shows several police officers, a black woman with a bandana in her hair, and

35

another black woman with glasses and a blue shirt. And you're saying -- were those the two women arrested?

A. They actually arrested the lady with the blue on. The Niagara Falls police took her into custody too. And I'm not sure who else.

MR. BOND: Okay.

(Whereupon, video footage was then played.)

BY MR. BOND:

Q. All right. What were the circumstances surrounding your daughter exiting the vehicle?

A. They told her to get out the vehicle and that she wasn't free to leave, that she was under arrest.

Q. Okay. And who told her that?

A. The Niagara Falls police.

Q. Do you know which ones?

A. What was the lady name? Kay something. I forget her name. Kay Richards.

Q. Was that based on what your daughter told you or what you heard?

A. No. From what I heard, what I seen.

Q. Okay. And what did you hear Kay Richards say to your daughter?

36

A. That -- she was the one that frisked her and put her in the handcuffs.

Q. Okay. And how do you know Officer Richards?

A. I don't know her.

Q. Well, how do you know her name?

A. Because my daughter read her name off of her tag.

Q. Okay. All right. So your daughter voluntarily got out of the vehicle. And at that point in time did you see her being handcuffed or that's what she told you?

A. When I seen them handcuffing her as they was taking me to the back of the patrol car.

Q. So they were walking you in the opposite direction, but you were able to see her being cuffed?

A. Yes.

Q. Okay. All right. And then you were placed in the back of the state police vehicle?

A. Yes.

Q. What happened next to you?

A. State troopers drove me to the state trooper police barracks, where they took me.

Q. All right. And how long were you there?

37

A. Couple hours.

Q. All right. And while you were at the state police barracks, did you have any interaction with any Niagara Falls City police officers?

A. No.

Q. And were you issued an appearance ticket?

A. Yes.

Q. And released from the state police barracks?

A. Yes.

Q. Did they take you home or you were picked up?

A. No, I got picked up.

Q. All right. And so the charges, the criminal charges that were filed against you were filed by the state police?

A. Yes.

Q. Okay. There were no charges filed against you by the City of Niagara Falls Police?

A. No.

Q. All right. Your daughter was issued a ticket for no seat belt?

A. Yes.

Q. Was that issued by a state trooper?

A. Niagara Falls I want to say.

38

Q. Okay.

A. I'm not sure. It could have been state police. I'm not sure.

Q. Okay. All right. So in the video that we watched, the two state troopers that were in the car that pulled the U-turn, they were advising you and your daughter that they observed that neither one of you was wearing your seat belt, correct?

A. Right.

Q. Okay. Was your daughter wearing her seat belt that day?

A. Absolutely.

Q. All right. Were you wearing your seat belt?

A. Absolutely. You can see my seat belt on in the video clearly.

Q. And then there was a discussion about you being issued a traffic citation for not wearing a seat belt, correct?

A. Right.

Q. And was it your understanding that in order to issue you a traffic citation, they would need to put your name on the ticket?

39

A. All they did was ask me to identify myself, to show them some identification.

Q. But then later on they were explaining to you that they couldn't issue a traffic ticket without putting your name on it, correct?

A. Right.

Q. Okay. But you didn't tell them your name?

A. No.

Q. All right. Did you understand that they couldn't issue a traffic ticket to you unless they knew your name?

A. I was at no obligation to talk to them.

Q. I know that. I'm just asking you, did you -- did it register with you that if they wanted to give you a ticket for not wearing a seat belt, that they couldn't just hand you a paper ticket without putting your name on it?

A. Yes.

Q. Okay. All right. While you were still -- how long were you seated in the state police vehicle after they handcuffed you before you left the scene?

A. About twenty minutes. I was laying in the back

40

seat.

Q. And during that twenty minutes, when -- the last time you saw your daughter, what was her situation?

A. They had her handcuffed over in the -- the Niagara Falls police had her handcuffed up against their car.

Q. All right. So when you left the scene in the state trooper vehicle, she was still handcuffed?

A. Yes, she was still handcuffed when we drove off.

Q. Okay. All right. Now, in the video you're referencing -- you're telling the troopers to call people because they know who you are. What names were you telling them to call?

A. John DiPasquale and William Persinger.

Q. All right. And who is John DiPasquale?

A. State trooper and investigator out of Lockport.

Q. And how did you know him?

A. I'm suing him in Federal Court.

Q. All right. And who is William Persinger?

A. State trooper out of Niagara Falls.

Q. Okay. How do you know him?

A. Suing him in Federal Court.

41

Q. Okay. And that case is presently pending?

A. Yes.

Q. Do you have an attorney handling that case?

A. I'm handling it.

Q. Okay. And the allegations against DiPasquale and Persinger, do those relate to an arrest that took place?

A. Yes.

Q. And when did that arrest take place?

A. Illegal arrest, false arrest, malicious prosecution that had happened in 2018.

Q. Okay. And was that the arrest which led to your conviction for grand larceny?

A. Yes.

Q. Okay. And the conviction for grand larceny, was that after a trial or a plea?

A. A plea.

Q. And who was your attorney?

A. Robert Viola.

Q. Okay. And those two troopers were the arresting officers in your grand larceny case?

A. Yes.

Q. And what were you accused of stealing?

42

A. I was accused of enterprise corruption.

Q. And you pled guilty to grand larceny?

A. Attempted enterprise corruption.

Q. Oh, okay. And I'm sorry. You said the nature of the lawsuit against those troopers is for malicious prosecution?

A. False arrest.

Q. Anything else?

A. Oh, it's a bunch of stuff in there.

Q. Okay. Are you claiming that they physically assaulted you?

A. Well, yeah. That's in the, that's in the -- we in the settlement stage of the case right now, Federal Court.

Q. Who are you dealing with in the settlement stage from the state?

A. Attorney General's Office.

Q. Yes. Do you remember the lawyer's name?

A. His name is -- I want to say Mercure. I'm not sure.

Q. Okay. Someone in the --

A. Because I got several lawsuits over there in Federal Court.

43

Q. All right. Do you have any lawsuits pending in Federal Court against the City of Niagara Falls?

A. No, not against the City of Niagara Falls.

Q. Okay. Do you have more than one pending against the state police?

A. No. I got another one pending against New York State and the Department of Corrections.

Q. For while you were incarcerated?

A. Yes.

Q. Any others?

A. I have a habeas corpus pending on my appeal, on my direct appeal for the conviction that's pending in Federal Court.

Q. The attempted enterprise corruption, that was a federal --

A. No, it was state.

Q. Okay. So did you have a federal conviction as well?

A. No.

Q. Okay. So the habeas corpus is pending, it relates to your state conviction for attempted enterprise corruption?

A. Right.

44

Q. All right. Okay. And are you handling the habeas corpus yourself?

A. Yes.

Q. All right. The lawsuits that you have pending against the Department of Corrections, are you handling that yourself?

A. Yes.

Q. So with respect to this Notice of Claim, you served the Notice of Claim upon the City of Niagara Falls. Did you serve a copy of the Notice of Claim upon someone for the state police?

A. Yes.

Q. Have you been contacted by anyone on behalf of the state police?

A. No. I served it the same day.

Q. Okay. And who did you serve?

A. At the Main Place Towers at the Attorney General's Office.

Q. All right. So we looked at today -- we looked at two videos that were taken on your phone from -- that you had with you inside the car, correct?

A. Right.

45

Q. And we also looked at some Ring video, correct?

A. Right.

Q. And then you showed me some still photos. Were those taken off of the Ring footage?

A. Some of them.

Q. All right. Okay. And then in addition to that, do you have other video or your wife has it?

A. Yeah, there's some other videos. I just don't have them here.

Q. Okay. All right. Well, I'm going to request that you send me the photos and the video. Probably the easiest way --

A. I actually attached it to the notice.

Q. Well, I think you attached still photos to the notice, but I need an actual copy of the video and the photographs. What I'll do is, I'm going to give you my cell phone number and ask you to send it to me there. Okay?

So I'm going to give you my business card with my cell number and ask that you send to me the video footage we observed today, the photographs, the still photos, and then any other video footage that you have from any other

46

source. All right?

A. All right.

Q. Okay. So let me -- just a little bit to follow up.

As a result of your arrest that day, were you physically injured?

A. Yes. I went to the hospital after that.

Q. Where did you go to the hospital?

A. Niagara Falls Memorial Medical Center.

Q. All right. Did you go there straight from the state trooper barracks?

A. Yes.

Q. All right. And what complaints did you have?

A. My wrists.

Q. Do you have photos of your injuries?

A. Yes.

Q. All right. So I'll ask that you send those to me as well.

A. I want to say -- that's at the hospital.

MR. BOND: What are we up to, 8? 7. All right.

(Whereupon, a Still Photo was then received and marked as Exhibit 7, for identification.)

47

BY MR. BOND:

Q. All right. So number 7 appears to be a still photo of your right hand?

A. Yes.

Q. Okay. And then it looks like there's one, two, three, four -- five photographs total, all of your right hand and wrist --

A. Right.

Q. -- correct?

All right. Did you have any other injuries other than the injuries in those photos?

A. No.

Q. All right. Did you have any x-rays performed at the hospital?

A. I believe they took me to x-ray. I believe they might have took me to x-ray.

Q. Okay. Did you have any broken bones?

A. No.

Q. Did they prescribe anything for you?

A. I believe they did.

Q. Other than going to the emergency room that night, did you seek any other medical treatment?

A. No.

48

Q. Okay. At some point did you have to go to court?

A. Yes.

Q. All right. Did you have an attorney?

A. No. I represented myself.

Q. How many times did you have to show up in court?

A. I want to say at least five times, maybe six times.

Q. All right. And at any time did you meet with the prosecutor to discuss resolution of the case?

A. No, I never met with him.

Q. All right. Did they offer you some sort of a plea deal?

A. They did.

Q. What did they offer you?

A. Jaywalking.

Q. And you refused?

A. Yes.

Q. All right. In any of the five or six appearances, were any of the state troopers there?

A. No.

Q. Okay. In any of the five or six appearances, did any representatives from the City of Niagara

49

Falls Police Department appear?

A. No.

Q. Okay. Ultimately, the charges were dismissed?

A. Yes.

Q. Because the troopers didn't show up for the trial?

A. Right.

Q. Okay. At some point -- or, who picked you up from state police barracks?

A. My wife.

Q. And when was the first time you talked to your daughter after you left the barracks, the state police barracks that night?

A. I don't remember if I seen her. I think she might have went back to Buffalo.

Q. Okay.

A. But we both went to court.

Q. All right. And so at some point did you learn that she had been issued a ticket for not wearing a seat belt?

A. Yes.

Q. And how many times did she have to go to court?

A. I think she went maybe two or three times.

50

Q. All right. And how was that ticket resolved?

A. They dismissed it.

Q. Did she have court dates the same day as you did?

A. Yes.

Q. All right. So her case was ended before yours?

A. Yes.

Q. And was her case dismissed because the troopers didn't show up?

A. Well, no, because Niagara Falls police officers didn't show up. She got -- well, remember, the Niagara Falls police officers is the ones that detained her.

Q. All right. I think you indicated they were the ones that handcuffed her. But do you know who issued her the traffic ticket?

A. No. I'm not sure.

Q. Okay. I mean, it was the state troopers --

A. It had to be the state troopers that issued the traffic ticket.

Q. Because they were the ones that claimed they saw her without wearing a seat belt, correct?

A. Right.

Q. All right. And to your knowledge, did your

51

daughter say whether she was injured as a result of this incident?

A. She didn't say that to me.

Q. All right. Did she seek any medical attention?

A. Not that I'm aware of.

Q. Do you know -- we marked as Exhibit 1 this Notice of Claim that you filed. Has she filed a similar Notice of Claim?

A. No.

Q. All right. So tell me about the spike strip.

A. Yeah. So the Niagara Falls police officers put the spike strip in front of the vehicle. Why they did that, I don't know. I can't tell you why they did that.

Q. Okay. When your daughter pulled over in front of your house and the state troopers approached the vehicle, was the vehicle still running?

A. No.

Q. Did they ask for her to take the keys out of the ignition?

A. No.

Q. So this entire time this video that you showed me was taking place, the keys were in the ignition

52

for the vehicle?

A. I'm not sure.

Q. Okay.

A. I know it wasn't running, though.

Q. You were -- in the video you were indicating to the troopers that they were racially profiling you and your daughter and that this is what they did in Niagara Falls. Do you recall those statements?

A. Yup.

Q. And so since you had been out of custody since April of '24 up until August 2nd, 2024, had you been stopped by any other police officers?

A. No.

Q. So this was your first encounter with any law enforcement agencies since your release from prison?

A. Right.

Q. Okay. And I'm sorry. How long had you been in jail?

A. Five and a half years.

Q. All right. Did you have to report what happened to your parole officer?

53

A. Yes.

Q. And who is your parole officer?

A. PO Bailey.

Q. Man or woman?

A. Man.

Q. Since your arrest on August 2nd, 2024, have you encountered any of the state police officers again?

A. No.

Q. Have you encountered any of the Niagara Falls police officers again?

A. No.

Q. Since August 2nd, 2024, have you been pulled over by any police officers?

A. No.

Q. Okay. Did you ever figure out what the unlicensed operation charge was about?

A. No.

Q. All right. So you showed me a photo. It looks like as this incident was taking place in front of your house, several people, neighbors came out?

A. Yes.

54

Q. All right. And I guess in the aftermath and you being handcuffed, was there interaction between those people and the state police and the Niagara Falls police officers?

A. Yes.

Q. All right. Did you ever talk to anyone about what was going on?

A. No.

Q. Were you able to hear what was going on?

A. What you mean, during the altercation?

Q. Yes. Were you able to hear what was going on? You had mentioned there were two women who were arrested arising out of this incident other than you and your daughter, correct?

A. Yes. I was in the back seat of the state trooper police car.

Q. Right. Do you know -- that's what I'm just asking, do you know what was going on? Were you able to tell what was going on and why they were arrested?

A. I'm not sure.

Q. All right. Did you ever talk to the two women?

A. I talked to one of them.

55

Q. What did she tell you?

A. That the Niagara Falls police had arrested her for -- could have been obstructing government administration.

Q. All right. Does your daughter have any children?

A. No.

Q. Other than your phone was in the vehicle, were there any other phones in the vehicle recording?

A. Not recording, I don't think.

Q. Okay. What other phones were in the vehicle?

A. I had another cell phone in there. The state troopers took that.

Q. Okay.

A. And my daughter had her phone.

Q. All right. So the troopers seized both of your phones?

A. Well, what the troopers did was, they searched the vehicle. I think it was one Niagara Falls police officer and one state trooper searched the vehicle.

Q. And this was while you were sitting in the trooper vehicle?

A. Yes.

56

Q. Okay. And was your vehicle ultimately towed?

A. No.

Q. All right. And they were searching it while you were still at the scene or that's what someone told you?

A. Well, I got it on video of one of the police officers searching the vehicle.

Q. All right. So someone gave you the video of that?

A. I believe it came off of the Ring camera. I'm pretty sure.

Q. Okay. And what did they take from the vehicle as far as you know?

A. They took some money and a cell phone.

Q. All right. How much money was it?

A. Nine hundred dollars or something like that.

Q. Did you get the money back?

A. Not yet.

Q. All right. What about the cell phones, did you get the cell phones back?

A. I got my cell phone back, but I didn't get the other cell phone back that they got.

Q. So you got one of the two cell phones back?

57

A. Yes.

Q. And the cell phone you got back was the one that you had used to record?

A. Yes.

Q. Okay. And so what's the status of the return of the cash that was taken from the vehicle?

A. I don't know, because I'm about to file that 1983 in Federal Court and I'll just resolve it in court.

Q. All right. So besides the second cell phone and some cash, was there anything else taken from the vehicle?

A. I'm not sure. Not that I know of.

Q. Okay. Was anything taken from your daughter?

A. I'm not sure.

Q. Okay. And the cash that was taken, do you know where it was found?

A. I want to say in the middle -- in the middle console I want to say.

Q. So ultimately, did you give the state troopers your name?

A. No. They took my license out of my pocket.

Q. Okay. And did they fingerprint you?

58

A. Yes.

Q. Did they question you at all while you were in custody?

A. They tried.

Q. And what were they asking you about?

A. Different little questions. I don't exactly remember what it was, but I wasn't talking to them.

Q. Did they ask you where you got the money from?

A. No.

Q. Excuse me?

A. No.

Q. All right. So we've talked about the different videos. So I think you're saying now you think -- you showed me a segment of Ring footage where the troopers were approaching your vehicle. You indicated there's another segment of Ring footage which you believe shows officers searching the vehicle?

A. Yes.

Q. And it's your recollection that you were still in the state trooper vehicle when that occurred?

A. Yes.

59

Q. Okay. Do you know, did anyone ask your daughter for permission to search the vehicle?

A. No, they didn't ask her.

Q. Okay. That's something you've discussed with her?

A. Yes.

Q. And did anyone ask you for permission to search the vehicle?

A. No.

Q. Do you know if anyone asked your wife if they could search the vehicle?

A. No, nobody asked my wife.

Q. Okay. Are there any other videos or photos that you have that we haven't talked about?

A. No.

Q. All right. So as I understand it, the only interaction you had with Niagara Falls police officers that day were conversations they had with you through the driver's side window when you were in the passenger's seat?

A. Niagara Falls police, yes.

Q. Okay. All right. And the name, Kay Richards, that's the name that your daughter said she saw

60

on the name tag of one of the officers?

A. Right.

Q. Okay. Has your daughter ever been arrested before?

A. No.

Q. So what year was she at Buff State?

A. She had been at Buff State for the past two years.

Q. Okay. And she stays there year-round?

A. Yes.

Q. Okay. Do you know where your daughter was when you were being handcuffed?

A. She was in handcuffs standing across the street.

Q. Okay. So she was handcuffed before you were?

A. No, I was handcuffed first.

Q. Okay. And if you know, was she saying anything to the troopers when they were handcuffing you?

A. The troopers, I guess, was trying to rough me up, and I guess she said something to them.

Q. Okay. When you say they were roughing you up, what do you mean?

A. Like they was twisting my arms behind my back and shoving me against the car.

61

Q.  Okay.  Against your car or against their car?

A.  Against my car.

Q.  Okay.  All right.  Do you remember who the judge was in City Court?

A.  Jenelle Faso.

MR. BOND:  Okay.

(Whereupon, video footage was then played.)

THE WITNESS:  Here the Niagara Falls police is taking her out the car.

BY MR. BOND:

Q.  Now we're looking at some Ring footage.

A.  They're taking her out of the car.  Several Niagara Falls police officers are placing her in handcuffs.

MR. BOND:  Okay.  This is 8.

(Whereupon, a Ring Video was then received and marked as Exhibit 8, for identification.)

(Whereupon, video footage was then played.)

BY MR. BOND:

Q.  So this shows your daughter being brought around to the back of the vehicle?

62

A.  Right.

Q.  And handcuffed with her hands behind her back, it looks like?

A.  Right.

Q.  Okay.  Did your wife come out during this incident?

A.  Yes.  She left the hospital.  She was at work.  She came back.

Q.  So by the time she arrived, were you still there?

A.  Yes.

Q.  Okay.  And do you know, did she have any conversation with any of the officers?

A.  I think she was asking them questions.

Q.  All right.  And do you know, when your wife arrived, was your daughter still handcuffed?

A.  Yes.

Q.  All right.  I think you said that there were four Niagara Falls police officers that arrived at the scene?

A.  Yes.

Q.  Okay.  And do you know how many were involved in handcuffing your daughter?

A.  It looked like it was four or five officers that

63

was on her.

Q.  All right.  Did she give you the name of any of the police officers other than Richards?

A.  No, that was it.

Q.  And the spike strip, when was that placed in the front of the vehicle?

A.  I'm trying to find the spike strip.

Q.  Let me ask you this.  Were you still inside the vehicle when the spike strip was placed in front of the vehicle?

A.  No -- yeah, I was in the vehicle when they placed it.  Yeah.

Q.  Okay.  All right.

A.  This video here shows the Niagara Falls police and the state troopers searching the vehicle.

MR. BOND:  Okay.  So again, we have another Ring video to mark as 9.

(Whereupon, a Ring Video was then received and marked as Exhibit 9, for identification.)

(Whereupon, video footage was then played.)

BY MR. BOND:

64

Q.  All right.  So in that footage it looks like I see a trooper going to the passenger's side of the vehicle.

A.  Right.

Q.  Do you see someone else going to another part of the vehicle?

A.  Then the Niagara Falls police followed him to the passenger's side of the vehicle.

Q.  Okay.  I mean, I see the trooper duck his head inside of the vehicle.

A.  He's walking around it.

Q.  I'm just asking because I can't -- I saw what appeared to be a trooper open the passenger's side of the vehicle and look in.  Did someone open the hatchback?

A.  No.  I think I might have some footage of that.

MR. BOND:  Okay.  And so -- I don't know how to stop it.  I'm sorry.

(Whereupon, video footage was then played.)

BY MR. BOND:

Q.  Just go back and look and maybe you can stop it when you see it.  It appears to me that there's a single trooper that walks along the passenger's

65

side and opens the passenger door.  I didn't see anyone behind him, but you were suggesting that was a Niagara Falls officer?

We can stop it there so I can see it.

A.  Okay.  So once the state police officer had gone to the vehicle, opening up the door and going to the passenger's side, there's going to be a Niagara Falls police that come around to assist him.  That's him right there.  He's going around to that side.

Q.  Okay.  All right.  So the video shows while the trooper's got his head stuck in the passenger's side, a Niagara Falls cop comes around from the rear of the vehicle walking towards the trooper.  And then the Ring camera footage stops?

A.  And then it picks back up again.  I'm trying to see.

Q.  All right.  Just for the record, during the Ring footage there's obviously -- is that your son and daughter that are upset?

A.  Yes, that's my kids -- my granddaughter.

Q.  Your granddaughter?  And who is watching the kids?

66

A.  We was there -- I want to say my son was in the house.  My son was there.

Q.  Your six-year-old?

A.  The twin, Lawtorya's twin brother.

Q.  And what's his name?

A.  Lawtorie.

Q.  Did he come out at all during this incident?

A.  I can't remember because I was in the back seat of the state trooper car.  Let me see.

Q.  So he's the same age as your daughter?

A.  Yes.

Q.  And what does he do?

A.  Right now he works at Home Depot.

Q.  Okay.  Does he live with you?

A.  No.

Q.  So other than the twins and your six-year-old and eight-year-old son and daughter with your present wife, do you have any other children?

A.  Oh, yeah.  I got a lot of children.

Q.  How many total?

A.  Twenty.

Q.  All right.  We've talked about Trooper Slawek and Trooper Curran.  Were those the two troopers that

67

handcuffed you?

A.  Yeah.  They were the ones that initiated it.

Q.  Okay.  The other two troopers that you believed that were there, do you know, were they involved in physically handcuffing you?

A.  I don't know because I had -- I was -- I had my back to them, so I don't know who came up from behind.  I know there was a bunch of them that was on me, though.

Q.  I think that's all I have.  Unless there's anything else that I haven't asked you that you think you should tell me because I forgot.

A.  I was just trying to find the video of the Niagara Falls police officers removing the spike strips.

Q.  Oh, okay.  So you think you might have some more video that shows the spike strip in place?

A.  Yeah.  There was several Niagara Falls police officers.

Q.  Okay.  But as far as you know, it was Officer Richards who handcuffed your daughter?

A.  Yeah.  I don't know what video it was in with the spike strips.  I'm trying to see.

68

Q.  Okay.  And other than Officer Richards, do you know if any other Niagara Falls officers had any physical contact with your daughter?

A.  There was a bunch of them on her.  I don't know.  I don't know which ones it was, but --

Q.  Okay.  All right.  So if I need to schedule your daughter to come in and testify, would it be easier if she came to my Buffalo office?

A.  Probably.

Q.  Okay.  Do you know what her classroom schedule is?

A.  I don't know that.

MR. BOND:  Okay.  All right.  I think that's all I have.  Thank you.

THE WITNESS:  Okay.

*   *   *   *   *

69

STATE OF NEW YORK)

SS:

COUNTY OF ERIE)

I, Christina S. Veguilla, a Notary Public in and for the State of New York, County of Erie, DO HEREBY CERTIFY that the testimony of VICTOR JOHNSON was taken down by me in a verbatim manner by means of Machine Shorthand, on April 29, 2025. That the testimony was then reduced into writing under my direction. That the testimony was taken to be used in the above-entitled action. That the said deponent, before examination, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth, relative to said action.

I further CERTIFY that the above-described transcript constitutes a true and accurate and complete transcript of the testimony.

CHRISTINA S. VEGUILLA,
Notary Public.

Victor Johnson — word index pages

Victor Johnson

**N**

**O**

**P**

Victor Johnson

**Q**

**R**

**S**

Victor Johnson

**T**

**U**

**V**

**W**

Victor Johnson

**X**

**Y**

LAWTORYA JOHNSON

STATE OF NEW YORK
SUPREME COURT : COUNTY OF NIAGARA

-------------------------------------------------

VICTOR E. JOHNSON, SR. and
LAWTORYA JOHNSON,

                    Claimants,

     -vs-

CITY OF NIAGARA FALLS,

                    Respondent.

-------------------------------------------------

               Examination Under Oath of

LAWTORYA JOHNSON, Claimant, taken pursuant to Notice under

Section 50-h of the General Municipal Law, in the law

offices of WALSH, ROBERTS & GRACE, LLP, 400 Rand Building,

14 Lafayette Square, Buffalo, New York, taken on June 3,

2025, commencing at 2:15 P.M., before VALERIE A. ROSATI,

Notary Public.

---

2

APPEARANCES:

LAWTORYA JOHNSON,
140 Rees Street,
Buffalo, New York 14213,
Appearing Pro Se.

WALSH, ROBERTS & GRACE, LLP,
By KEITH N. BOND, ESQ.,
and DILLON J. MESI, ESQ.,
400 Rand Building,
14 Lafayette Square,
Buffalo, New York 14203,
Appearing for the Respondent.


          L A W T O R Y A   J O H N S O N,

     140 Rees Street, Buffalo, New York 14213,

        after being duly called and sworn,

               testified as follows:


EXAMINATION BY MR. BOND:

Q.  Good afternoon, Ms. Johnson.  Thanks for coming
    today.  Before we start talking about the events
    of August 2nd, 2024, I just want to get some
    background information from you.  All right?
A.  Yes.
Q.  All right.  How old are you?
A.  Nineteen.

---

3

Q.  What is your date of birth?
A.  August 6th, 2005.
Q.  And were you born and raised in Niagara Falls?
A.  I was born in Buffalo and raised in Niagara
    Falls.
Q.  And where did you go to high school?
A.  Niagara Falls High School.
Q.  What year did you graduate?
A.  2023.
Q.  And where were you residing your senior year in
    high school?
A.  924 Fairfield Ave., my parents' house.
Q.  With your dad?
A.  My mother.
Q.  Okay.  What is your mother's name?
A.  Lynda Johnson.  L-Y-N-D-A.
Q.  All right.  And when this incident occurred that
    we're here to talk about today, in August of --
    August 2nd, 2024, were you residing at the
    Fairfield address?
A.  No, I was not.
Q.  Where were you residing at that point?
A.  I was on campus for school at Buffalo State.

---

4

Q.  Okay.  And so was that your first semester at
    Buff State?
A.  No.  It was my second semester.  Going into my
    second semester.
Q.  All right.  You graduated from high school in
    June of 2023?
A.  Yes.
Q.  And when did you start at Buff State?
A.  August 28th, 2023.
Q.  All right.  So this would have happened at the
    end of your freshman year of college?
A.  Sophomore year.  It was sophomore year.
Q.  All right.  So what year are you now?
A.  I took a semester off.  I'm still a sophomore
    right now.
Q.  Okay.  You attended Buff State in the fall of
    2023 and then the spring of, and then the spring
    of 2024?
A.  And then the fall of 2024.
Q.  Okay.  And back in August of -- August 2nd, 2024,
    who else resided at the Fairfield Avenue address?
A.  My father; my mother; my siblings, Layyah Johnson
    and Legacy Johnson.  I believe that's it.

5

Q. I understand -- do you have a twin brother?

A. Yes, I do.

Q. What is his name?

A. Lawtorie Johnson, L-A-W-T-O-R-I-E.

Q. And did Lawtorie -- did your brother reside at the Fairfield Avenue address?

A. I'm trying to figure out if he moved or not before that. I believe he moved before that. I'm not sure of his current address.

Q. All right. What is your father's name?

A. Victor Johnson. V-I-C-T-O-R Johnson.

Q. All right. And besides your twin brother, Layyah and Legacy, does your father have other children?

A. Yes.

Q. All right.

A. Yes, he does. He has a lot.

Q. Do you know how many?

A. Not by number, per se. It's more than I could count on my hands.

Q. Does he have other children with your mother?

A. Yes. In total I believe they have seven or eight kids.

Q. All right. So your mother, Lynda, and your

6

father, Victor, have approximately seven or eight children together?

A. Yes.

Q. So you have seven -- six or seven siblings?

A. Yes.

Q. All right. And back in August of 2024, were you working that summer?

A. Yes, I was.

Q. Where were you working?

A. I'm always working. I was working at the mall that day. Columbia, the outlet.

Q. All right. And do you know approximately what time this incident occurred with the police on August 2nd, 2024?

A. No, I actually don't.

Q. Some of the records I have suggest it was like sometime after seven p.m. Does that sound about right?

A. Yeah, I believe so.

Q. And what time did you get off work? Do you remember?

A. I don't know if I was closing that day. If I was closing that day and if it was a Sunday then I

7

got off at six o'clock.

Q. All right. It was a -- I think the records show it was a Friday so --

A. I don't know.

Q. Okay. Well, let me ask you, how did you get to work that day? Did you drive yourself?

A. Yeah. Yes, I did.

Q. And so when you left work that day, where did you go?

A. I picked my father up and then I was on my way home.

Q. Okay. Where did you pick your dad up?

A. From the restaurant that he works at.

Q. What's the name of the restaurant?

A. Geno's Good Eats.

Q. Geno's Good Eats?

A. Yes.

Q. What type -- is it like a pizzeria or what is it?

A. Everything.

Q. Is it a sit-down restaurant or take-out?

A. Take-out.

Q. And where is that located?

A. 742 E (sic) Street, Niagara Falls, New York.

8

Q. All right. And what car were you driving on the day of the incident?

A. Was I driving my mother -- I was driving my mother's car.

Q. Okay. Do you remember what kind it was?

A. A Buick. Probably a 2007.

Q. All right. Was it a Rendezvous?

A. Yes.

Q. What color?

A. Black.

Q. Did you have a driver's license back then?

A. No. I had a permit.

Q. Do you know if your dad had a driver's license?

A. I'm not so sure.

Q. And was it prearranged that you would pick your dad up when you were on your way home from work?

A. No, it was not.

Q. How did that come about?

A. He just ended up calling me when I got off, and he needed to go back to the house before I actually went back -- came back to Buffalo so --

Q. All right. So after you got out of work at the mall, you came back to Buffalo?

9

A. That -- I was trying to figure --
Q. Were you on your way back?
A. I was going to my mom's house because I had to stop by there to grab a few things before I left, because I like to go to her house and then leave.
Q. Gotcha. All right. So did you actually make it back to your mom's house before your dad contacted you?
A. No.
Q. All right. So you were on your way to your mom's house and then your dad contacted you to come get him?
A. Yeah. I actually stopped at the restaurant and then we ended up going to my mother's house. That's when it escalated from there.
Q. So do you remember what route you took from the restaurant to your mother's house on Fairfield?
A. It was either the -- the streets are so complicated. Is it the Boulevard or Military? I think it's the Boulevard. Is it the Boulevard? I get these two mixed up.
Q. Well --
A. I'm not so sure.

10

Q. -- Military is over by the outlet mall.
A. Yeah. And so is the Boulevard. Because I either go -- it's, it's either/or.
Q. Well, I guess I'm just trying to find out, after you picked your father up, which way did you go?
A. Oh, after I picked him up?
Q. Yeah.
A. Okay. So I picked him up from the street on 19th, and then I went down 19th.
Q. All right.
A. And then what is it? Willow? Is it Willow? I think it's Willow. I think it was Willow. But then we -- where Abbott Elementary School is at, that's the street we went down.
Q. Okay. Well, your mom's house is on Fairfield, correct?
A. Yes.
Q. At some point did you turn off of a street to get on -- did you turn off a street onto Fairfield?
A. No. I was -- okay. So there's a bridge before you get to my mother's street. So it's like a little straight street. I believe there was Highland Ave.

11

Q. Okay.
A. And then we just went straight down and then went to her street.
Q. All right. So you were on Highland Avenue?
A. At the light.
Q. At the light?
A. Yes.
Q. And what intersection? Do you know?
A. I believe it was Ontario and Highland.
Q. All right. So you were heading up Highland to your mother's house?
A. Yes.
Q. And then you made a left onto Fairfield?
A. Yes.
Q. Okay. And it was just you and your dad in the car?
A. Yes.
Q. You were driving?
A. Yes.
Q. He was in the passenger seat?
A. Yes.
Q. Okay. And does your mother's Buick Rendezvous, does it have seat belts?

12

A. Yes.
Q. What kind of seat belts are they? The shoulder harness --
A. Yeah.
Q. -- comes across, the harness?
A. Yes.
Q. Okay. Were you wearing your seat belt as you were --
A. Always wear my seat belt. Yes.
Q. -- driving that day?
   All right. What about your dad?
A. Yes. I told him to put it on.
Q. Okay. You had to remind him to put it on?
A. Like even if we didn't pull off yet, put your seat belt on. That's it. Click it or ticket.
Q. That's right. I guess the advertising works.
A. Well, I actually got it from a YouTuber a long time ago, and I just use that ever since.
Q. All right. Before this incident, had you ever gotten a ticket for no seat belt?
A. No. Never.
Q. All right. Did you have any traffic infractions on your record?

13

A. Never.

Q. All right. So from the time you and your dad left the restaurant up until the time you were pulled over, did you have your seat belt on the whole time?

A. Yes, I did.

Q. And did your dad have his seat belt on the whole time?

A. Yes, he did.

Q. Okay. Now, at some point as you were driving to your mother's house that afternoon, did you see a police vehicle?

A. Yeah. They were everywhere actually.

Q. Well, before you got stopped, as you were driving, did there come a time when you saw a police vehicle?

A. Yeah. At the light, on the way going to my mother's house. He was on the other side going this way and I was going this way.

Q. Okay. So you -- was that when you were stopped at the intersection of Highland and Ontario?

A. No. Well, that's when I seen it. It was behind a few cars. Yes.

14

Q. Okay. So were you stopped at a light when you first saw the other vehicle?

A. Yes.

Q. And was it a state trooper vehicle?

A. Yes.

Q. Was it a marked police car?

A. Yes.

Q. All right. And where you were stopped at the traffic light, how many lanes of travel are there in each direction?

A. It's two -- well, it's one going this way and the other one going the other way.

Q. Okay. So it's a two-lane street?

A. Yes.

Q. One in each direction?

A. Yes.

Q. All right. And were you the first car at the traffic light in the direction you were traveling?

A. I believe so, yes.

Q. Okay. And where was this state police vehicle?

A. I believe it was behind a car or a truck, SUV maybe.

15

Q. All right. So there were vehicles traveling -- stopped at the light in the opposite direction?

A. Yes.

Q. And you believed that the state police vehicle was one or two cars behind another vehicle?

A. Yes.

Q. Okay. And so at some point did the light turn green?

A. Yes.

Q. And did you proceed down Highland towards Fairfield?

A. Yes, I did.

Q. Okay. And what happened then?

A. After I got over the bridge, I looked in my mirror and I seen a cop behind me. I didn't really understand -- like I didn't know if he was going to pull me over or not, because he had no reason to pull me over. So I just continued to my mom's house. After I turned the corner to my mother's street and got to -- well, before I got to her house, actually, it was probably like maybe two, two, three feet away, they turned their sirens on. And I pulled over, but we were

16

already at the house.

Q. All right. So at some point after you pulled away from the traffic light at Highland and Ontario, you noticed that there was a police vehicle behind you?

A. Yes. After I got off Highland bridge.

Q. Okay. And was it a state police vehicle?

A. Yes. State trooper.

Q. At that point were you able to tell if it was the same troopers that had -- same trooper vehicle that had been going in the opposite direction?

A. Yes, actually.

Q. And how could you tell?

A. I don't know. I get paranoid when it comes to police officers.

Q. Okay. So how could you tell it was the same one?

A. There were no cop cars behind the car at the light that I was at, so he had to have turned around --

Q. Okay.

A. -- to meet me.

Q. So you're assuming that the vehicle you saw stopped at the light --

17

A. U-turned.  He U-turned.

Q. -- turned around and started following you?

A. Yes.

Q. Okay.  And I'm not all that familiar with the Highland bridge and where Fairfield is.  So for what distance was the trooper vehicle following you?

A. I'm not sure of the distance.

Q. Was it like a couple blocks or was Fairfield right there?

A. Fairfield is literally right off the bridge.

Q. Okay.

A. So maybe a car distance away.

Q. Okay.

A. Most likely.

Q. All right.  And when you first noticed the trooper vehicle behind you, was it -- if you know, was it accelerating or was it just traveling at about your speed?

A. It was just traveling.

Q. Okay.  And so after you got down off the bridge, you made a left-hand turn onto Fairfield?

A. Yes.

18

Q. And how far down Fairfield is your mother's house?

A. I believe -- it's kind of at the end of the street, but before you get off that street.

Q. So are there any cross streets on Fairfield?

A. Yes.  I don't know the street names.

Q. How many cross streets are there?

A. Just one.

Q. Just one?

A. Yes.

Q. All right.  And so when the police activated their lights and -- did you say their siren as well or just their lights?

A. I believe it was just their lights.

Q. Okay.  When they activated their lights, was it before -- had you passed this cross street already?

A. Yes.

Q. All right.  And so once they activated their lights, what, if anything, did you do?

A. I just continued to make sure that I had room enough to pull over, and then that's when I continued to pull over.

19

Q. Okay.  And so which side of the road did you pull over on?

A. The right-hand side.

Q. And which side of the street is your mother's house?

A. The right-hand side.

Q. Okay.  And once the police activated their overhead lights, did you have any conversation with your father?

A. He just told me, calm down, they have no reason to pull you over, honestly.

Q. Okay.  What about when you noticed the cop car in your rear or side-view mirror, did you have any conversation with your dad about that?

A. Not really, no.

Q. Okay.  You didn't tell him, hey, there's a cop behind me?

A. No.

Q. All right.  So at some point, then, after you brought your vehicle to a stop, were you in front of your mother's house?

A. Yes.

Q. All right.  What happened next?

20

A. After I got to my mother's house, the cop got out -- two cops got out the car, the driver and the passenger.  The driver came to my side; the passenger went to my father's side.  He asked for my license and registration, and I asked him what was the reason he pulled me over.  He said seat belt.  Okay.  So that's where we have a problem because when he pulled me over, my seat belt was on.  Before he pulled me over, my seat belt was on.

Q. All right.  When he approached your car and asked for your license and registration, did you still have your seat belt on?

A. Yes.

Q. Okay.  So he told you he was, he was asking for your license and registration because you had not been wearing your seat belt?

A. No, I was wearing my seat belt.

Q. No.  No.  Is that what he said to you?

A. Oh, yes.

Q. Okay.

A. Yes.

Q. So what, if anything, did you do or say in

21

response?

A. Let me think. I believe I told him that I was wearing my seat belt, but then after I told him I was wearing my seat belt, he also said that my father wasn't wearing his seat belt. And my father still had his seat belt on when he pulled us over.

Q. Okay.

A. I gave him my license and registration. Then he went -- it was -- it seems like it was a lot going on at the time. That's why it's so hard to recall.

Q. So when you say you gave him your license and registration, you mean you gave him your permit?

A. Yes.

Q. And the registration for the vehicle?

A. Yes.

Q. Where was the registration for the vehicle?

A. I believe in the glove compartment or the armrest.

Q. Okay. So did you get it out or did your father give it to you?

A. I did.

22

Q. Okay. So the officer that was -- that approached the driver's side of your car, do you know what his -- was it a man?

A. Yes. It was two men.

Q. It was a state trooper?

A. Yes.

Q. Do you know what his name was?

A. No, I do not.

Q. Okay. Your dad had mentioned the names of --

A. I'm very bad at names.

Q. -- a Trooper Slawek and a Trooper Curren. Any --

A. I'm not sure about the names.

Q. All right. So the gentleman that approached you was wearing a New York State Trooper uniform?

A. Yes.

Q. White, black, Caucasian?

A. Brown. Well, it was -- well -- oh, his skin color?

Q. Yes.

A. He was white. Caucasian.

Q. All right. Any facial hair or any other features?

A. I'm not sure if he had a beard, a little goatee

23

maybe.

Q. Okay. Any glasses?

A. No glasses, I believe.

Q. All right. And after you handed him your permit and registration, what, if anything, did he do?

A. I believe we actually continued to have a conversation because at that time he was lying. So I don't like liars. That's a pet peeve for me. So we're discussing back and forth on why he actually pulled me over. And he continues to say I didn't have my seat belt on, but then he goes to say my father didn't have his belt on.

Q. Okay.

A. And then after that, he went to go check my permit and everything.

Q. All right. So you just explained to me what he was saying as to why he pulled you over. What were you saying to him as to why he pulled you over?

A. I told him that I always wear my seat belt and I had my seat belt on, so what is the real reason you pulled me over? And it seemed like, it seemed like everything that he was saying was

24

just lies.

Q. All right. Were you and he having an argument?

A. Kind of, yes.

Q. Okay. Was he raising his voice?

A. Yes.

Q. Were you raising your voice?

A. Yes.

Q. All right. Were you swearing at all?

A. Not until everything escalated, honestly.

Q. Was he swearing at that point?

A. No.

Q. Okay. So at some point that officer then goes back to his patrol car with your permit and registration?

A. Yes.

Q. All right. And at that point is there any police officer standing at your window at this point?

A. I don't think so, no.

Q. At this initial encounter that we've been talking about the entire time, you remained seated in your vehicle?

A. Not the entire time.

Q. No. No.

25

A.  Oh, this incident?

Q.  I'm breaking it down.

A.  Yes.  Yes.

Q.  From the time you were stopped until the officer went back to his car with your permit and registration, you remained in the car?

A.  Yes.

Q.  All right.  And during this time when the officer left with the license and registration, was your father still in the car?

A.  Yes.

Q.  All right.  And were you able to hear any conversation your father was having with the other -- with the trooper that had approached his door?

A.  Yes.  The passenger police officer, he asked my father for his ID.  My father did not want to give him his ID because he said that he had no right to, so I'm -- hey, free country.

Q.  Yep.

A.  So then I guess they continued to go on and on about everything, and my father is very back and forth and he wants to get his point across, and

26

so does the police officer.  So that's when two things didn't co-exist correctly.  My father was on Live that day on Facebook, so everything was documented.  I'm not very sure how it escalated so fast, but my father, when the officer asked him for his identification, he didn't give it to him, so then I think that's when the officer got agitated with my father, and that's when it escalated.

Q.  When you say Facebook Live, at some point did you or your father start videotaping this interaction?

A.  I believe my father was on Live probably before they pulled us over, honestly.

Q.  Okay.  What is Facebook Live?  I'm not familiar with that.

A.  It's literally a social platform and you just stream basically.  It's like a streaming live, like the news basically.

Q.  But is what you're streaming recorded?

A.  Yes.

Q.  On your phone --

A.  Yeah.

27

Q.  -- on the person's phone that's streaming?

A.  It's on the phone.

Q.  Okay.  And do you remember during this interaction between your father and the other officer on his side of the car where your father's phone was?

A.  In his hand.

Q.  Okay.  And so it's -- just to be clear, the officer that you observed approach on your father's side of the car was also a trooper?

A.  Yes.

Q.  White male?

A.  Yes.

Q.  Do you remember any other features about his appearance?

A.  He was a bit smaller than the driver.

Q.  Okay.  And so this exchange that was taking place between the trooper and your father, I get the sense they were going back and forth with each other.

A.  Yes.

Q.  All right.  And were they raising their voices?

A.  Yes.

28

Q.  Okay.  Do you know if your father was swearing at all?

A.  Most likely, yes.

Q.  Okay.  And did you have any conversation with the trooper who was on your father's side of the car?

A.  I don't believe so, no.

Q.  Okay.  All right.  So just so we're clear, once the trooper leaves with your permit and registration to go back to his car, you're sitting in the car and your father and this other trooper are still having an exchange of words?

A.  Yes.

Q.  And the trooper's asking your father for his identification?

A.  Yes.

Q.  And your father is refusing to give it to him?

A.  Yes.

Q.  Did you hear the trooper say anything to your father about why he wanted his identification?

A.  I'm not sure, no.

Q.  Okay.  Did you hear your father say anything about why he wouldn't give him his identification?

29

A. Yes. Because he didn't have no right to because he's a passenger.

Q. Okay. All right. What do you recall happening next?

A. I believe this was before -- yeah, this was way before I got my identification back. It all happened so fast. The next thing I know, my father is getting ripped out the car.

Q. Okay.

A. And then I got out the car. And then they -- and I tried to run behind the car to get to my father, but before I could even get to my father, they stopped me and put me in handcuffs.

Q. Okay. So when you say they, do you know who you're talking about?

A. I believe it was a female responding -- there were a lot of cop cars in front of my mother's house, maybe like three, four police officers.

Q. Okay.

A. It was a female. She was responding with another male passenger. I'm not -- I don't recall her name, but I'm pretty sure it's in the video.

Q. Okay. Was she a Niagara Falls police officer?

30

A. Yes.

Q. And how could you tell?

A. The police car, her badge. That was probably it.

Q. All right. So I'm just trying to get the sequence here. So at some point did other police vehicles arrive at the scene?

A. Yes.

Q. All right. Did other state police vehicles arrive at the scene?

A. No. I believe it was just that one state trooper.

Q. So there was only two state troopers on site?

A. Yes.

Q. All right. And then how many Niagara Falls police officer vehicles arrived?

A. I believe there was three.

Q. Okay. So at some point did the state trooper who had your permit and registration come back to you?

A. Yes. Eventually.

Q. And were you still seated in the car at that point?

A. No.

31

Q. Okay. So this was -- by the time he got back to you, it was after you had gotten out of the vehicle?

A. Yes.

Q. All right. Before you got out of the vehicle, did you have any conversation with any officers from the Niagara Falls Police Department?

A. No.

Q. Before you got out of your vehicle, did you see any police officers -- Niagara Falls police officers talking to your father?

A. No.

Q. Did you hear any Niagara Falls police officers talking to your father?

A. No.

Q. All right. Did you see this female officer and male officer arrive?

A. Honestly, no, I didn't.

Q. Okay. Were all the -- were the police vehicles that arrived that day, were they parked all behind you or where were they parked?

A. The police officer that put me in the cop car was on the right-hand side, like the other side of

32

the street. And then I believe there was another car in front of that and then a police car blocking the crosswalk --

Q. Okay.

A. -- of the street.

Q. All right. So I think you said that at some point you see your father's removed from the vehicle.

A. Yes.

Q. All right. And what did you observe happen to remove him from the vehicle?

A. Basically, they literally opened the door -- well, he opened the door and grabbed my father out the car and shoved him against the car.

Q. Now, this entire time that your father was talking to the other officer, did he have his seat belt on?

A. Yes.

Q. Okay. So how did they get him out of the car if he had his seat belt on?

A. It's either he took it off or they took it off. I'm not so sure. Either/or. He probably took it off himself.

33

Q. All right. And at some point before the door on your father's side was opened, did you hear any conversation with your father and the police officer where he was being told to get out of the vehicle?

A. No.

Q. All right. So you never heard a trooper or anyone tell your father to get out of the vehicle?

A. No.

Q. All right. And so was it the same trooper who had been -- had approached your father's side that opened the door?

A. Yes.

Q. All right. And at that point, was he the only officer out --

A. By the car, yes.

Q. All right. And so did he -- did this trooper then pull your father out of the vehicle by himself?

A. Yes.

Q. So he didn't have the assistance of any other troopers?

34

A. No.

Q. All right. And what, if anything, was your dad saying when he was being pulled out of the car?

A. I'm not so sure.

Q. Okay.

A. It was a lot of background noise. It was a lot going on that day.

Q. Okay. And so once the trooper got your dad out of the vehicle, what, if anything, did you see happen next?

A. As soon as I seen him get out of the car, he was literally pushed against the car.

Q. Okay.

A. Shoved against the car. Face smudged on the door window, the back door window.

Q. Okay.

A. And that's when I got out the car and ran around the car.

Q. And why did you get out of the car?

A. Because I don't like seeing my people get treated like that. That's very, very wrong.

Q. What was your intention? What did you intend to do when you got out of the car?

35

A. I don't know. I don't know.

Q. All right.

A. It was just an instinct.

Q. Were you upset --

A. Yes --

Q. -- based on what you saw?

A. -- I was very upset.

Q. Okay. Were you angry?

A. Yes.

Q. And I think you said as you got out of the vehicle, you worked your way around the back of the vehicle.

A. Yes.

Q. And on the way to the back of the vehicle, did you pass any police officers?

A. I couldn't -- well, yes, I did. I passed the female police officer and then -- it was either a male police officer or that female police officer. I know the female police officer put me in the back of the police car.

Q. Okay.

A. It was either the male or the female that put me in handcuffs.

36

Q. All right. And when you got to the back of your car, was the female police officer blocking your way?

A. Somebody was blocking my way.

Q. Okay. And what did you do to move past that person?

A. I couldn't do anything.

Q. All right. So you didn't try and get past the person?

A. No.

Q. You didn't -- did you have any contact with the police officer, physical contact?

A. As soon as I got to the back of the car, they stopped me and literally put my hands behind my back and pushed me against the car.

Q. How did they stop you?

A. Literally -- I believe -- they were either in front of me or in the back of me, and they just grabbed me and said, no, you're not free to go either.

Q. Okay. Now, from the time you get out of the car as you were going around the back before the officer stopped you, were you saying anything?

37

A. I believe I said something along the lines of, no, ya'll cannot do this. Because they literally smacked my father against the car.

Q. Okay. And so when you got out of the car and went around the back, was it your intention to go to your father's aid?

A. Yes.

Q. All right. So you're stopped at the back of the police -- back of your mother's vehicle and someone places you in handcuffs?

A. Yes.

Q. All right. And you're handcuffed behind your back?

A. Yes.

Q. All right. And at this point are you able to see what's going on with your dad?

A. No.

Q. Okay. So once you're handcuffed -- how did they handcuff you?

A. Put both of my hands behind my back and cuffed me and then put me in the cop car.

Q. All right. And so when they were attempting to handcuff you, did you resist?

38

A. No.

Q. So you cooperated with putting your hands behind your back?

A. Yes.

Q. All right.

A. The handcuffs hurt, man.

Q. All right. Let me ask you, before this incident, had you ever been arrested before?

A. No. Never.

Q. Had you ever been handcuffed before?

A. No. I don't believe so.

Q. Did you recognize any of the Niagara Falls police officers?

A. Not the Niagara Falls police officer, no, but the state trooper, yes.

Q. All right. And where did you recognize the trooper from?

A. He looked very, very, very familiar. I don't know where I seen him, but he looks very familiar, like he does this for a living.

Q. So which trooper did you recognize?

A. The driver.

Q. The one that came up to your window?

39

A. Yes.

Q. Have you seen either of the troopers since this incident?

A. Yes, actually.

Q. Where?

A. I was in Niagara Falls that day. I'm not sure. I believe I rode past him probably a week later.

Q. And he didn't --

A. Yeah, he didn't --

Q. -- he didn't pull you over?

A. No.

Q. When you drove past him, the person a week later, was there one trooper or two in the car?

A. I believe there was two.

Q. Okay. What about the Niagara Falls officers? I think you said there was a male and a female.

A. Yes.

Q. All right. Were those the only -- those two Niagara Falls officers the only ones you interacted with on the day of this incident?

A. Yes.

Q. But other officers showed up?

A. Yes.

40

Q. But you didn't have any contact with them?

A. No.

Q. The other officers didn't talk to you?

A. No.

Q. The other officers weren't involved in handcuffing you?

A. No.

Q. All right. I know you said you were handcuffed. Other than being handcuffed, were you struck or hit by any of the officers?

A. No.

Q. All right. So once, once you were handcuffed, what happened next?

A. As soon as I got handcuffed, they put me in the back of the squad car. And then after that, my mother came from work and there was neighbors, my siblings, my niece, all outside, and the neighbors got involved.

Q. So after you were handcuffed, was there a period of time when you were out on the street before you were put in the car?

A. Yes. I was trying to get ahold of my mother. My phone I believe was in the car, and a neighbor

41

tried to get my phone to call my mother to come home, but the police wouldn't let her get my phone and let me put my password in so she could call my mom.

Q. At some point did somebody give you your phone?

A. No. I just -- somebody end up calling my mother.

Q. Okay. Did you have more than one phone?

A. No.

Q. All right. So I just looked at a clip. I thought I saw where you were standing outside --

A. Oh, yeah. I was on my father's phone on Live. Like as soon as they grabbed him out the car, I grabbed his phone and I recorded it.

Q. All right. So during this entire time, you had your father's phone on you?

A. Yes.

Q. All right. And was there any reason why they couldn't use your father's phone to call your mother?

A. They end up taking my father's phone out of my hand as soon as I started recording, the lady that put me in handcuffs.

Q. Okay. Well, once you were handcuffed, how were

42

you recording?

A. Like this (indicating).

Q. With your hands behind your back?

A. Yeah.

Q. Okay.

A. So after I -- they literally took the phone and put it on top of their squad car and put me in the back of the police car.

Q. All right. Was it -- what kind of police car was it?

A. SUV.

Q. Was it a marked car or --

A. Yes. I believe so.

Q. And do you know when they put you in the police car -- I just saw some parts of it. Looks like a crowd had gathered?

A. Yes.

Q. Lot of people were excited?

A. I'd say black people sticking up for black people.

Q. All right. And in the course of black people sticking up for black people, there was a lot of shouting going on?

43

A. Yes.

Q. There was a lot of disagreement going on?

A. Yes.

Q. All right. And were some people -- some other people trying to come to your assistance --

A. Yes.

Q. -- while you were standing there handcuffed?

A. Yes.

Q. All right. And so that created some tension between the officers and those people?

A. Yes.

Q. Okay. And then at some point did your mother arrive?

A. Yes. I believe she arrived when I was in the police car. I'm not so sure. It was either while I was in the police car or after I got out, because she -- I literally just seen her walking down the street.

Q. Okay.

A. And that's when she tried to talk to the police officers and everything. And I believe they end up -- the state trooper that initially pulled us over, they end up putting my father in the back

44

of the police car. I didn't know until the police car -- until I got out the police car myself and they drove away.

Q. All right. So let me ask you this. During the time after you were handcuffed and while you were standing there handcuffed and while you were in the police car handcuffed, could you see anything going on with your father?

A. No. Not really, no.

Q. Could you hear anything going on with your father?

A. I just heard a lot of background noise.

Q. And so is it fair to say you didn't actually see your father get put in a police car?

A. Yes, that's fair.

Q. All right. And once you were handcuffed -- I think you said you were handcuffed and someone said you were not free to go.

A. Yes.

Q. While you were handcuffed and standing outside the police car, did you have any other conversation with the Niagara Falls police officers?

45

A. Most likely, yes. I mean, it wasn't a conversation, per se. I'd say more of a disagreement or argument.

Q. All right. Well, you were upset because you were handcuffed?

A. Yes.

Q. Were you swearing?

A. Most likely, yes.

Q. All right. And do you remember anything the police officers said?

A. Not really, no.

Q. Okay. At any point did they tell you you were under arrest?

A. No.

Q. Okay. And so how long were you standing outside handcuffed before they put you in a patrol car?

A. Probably two minutes. Not even.

Q. Okay. And then how long were you in the patrol car before they got you out?

A. Probably five, ten minutes.

Q. Okay.

A. Maybe five minutes.

Q. Okay. And when they put you in -- I think you

46

said it was the female officer who put you in the patrol car.

A. Yes.

Q. Did she say why she was putting you in the patrol car?

A. No.

Q. When she put you in the patrol car, was this after people had come -- tried to come to your assistance?

A. Yes.

Q. All right. So you're in the patrol car for five to ten minutes with your hands cuffed behind your back?

A. Yes.

Q. All right. What happens next?

A. There's a lot on my mind in the back of the police car. That's all I'm thinking. It's -- I wasn't able to do anything. I couldn't see anything, per se. So I'm literally in the back of the police car just like, I need to go, I need to get out of here, like seriously, I can't do this.

Q. Okay. And while you're in the police car, you

47

don't see what's going on with your father, but you can see there's a crowd of people outside?

A. Yes.

Q. And there's a bunch of police officers there dealing with the crowd?

A. Yes.

Q. Okay. So who finally gets you out of the patrol car?

A. I believe it was maybe the same female that put me in the car.

Q. When she got you out, what, if anything, did she do?

A. I believe she uncuffed me, and then I went to go see if my siblings were okay.

Q. And what -- did she say anything when she uncuffed you?

A. No.

Q. Okay. Now, at some point -- we haven't touched upon the trooper giving you a ticket or coming back with your permit and registration.

A. I believe it was before he drove off with my father in the car.

Q. So was that while you were still inside the

48

police vehicle?

A. No. This was after.

Q. So you had been taken out?

A. This was after the whole altercation happened. Like it was dimming down. So after I got out of the police car, they uncuffed me. I believe probably a few minutes went by and he end up giving me my ID back, and he said, I'm just going to give you a ticket. You have so-and-so time to report to court and -- yeah.

Q. And where were you standing when he gave you that -- where you had that conversation with him?

A. In the driveway.

Q. Okay. Did he give you a ticket for not having a license?

A. No.

Q. So what did he give you a ticket for?

A. Seat belt, I believe.

Q. All right. And when he was having this conversation with you in the driveway, did you know where your father was?

A. He was in the back of the police car, I believe.

Q. Okay. You were able to see him in there?

49

A. No, I couldn't see anything.

Q. All right. And where was your mother at this point?

A. I believe she was either talking to a police officer or checking on her kids.

Q. All right. Okay. So then after the officer hands you the ticket, do you say anything to him when he gives you the ticket?

A. Yeah, I did.

Q. What did you say?

A. I'm not listening to nothing you saying. That's it. I said that and I just walked away. I wasn't in the mood to talk to him.

Q. Okay. All right. And so once the female officer uncuffed you, did you have any other interaction with any Niagara Falls police officers that day?

A. Probably. I mean, not personally, no, but like from a distance, yes, maybe.

Q. All right.

A. Maybe just yelling, screaming.

Q. All right. But once you were uncuffed and out of the car, that was sort of the end of your --

A. Yes.

Q. -- contact with the Niagara Falls police officers?

A. Yes.

Q. Okay. And who -- which police agency left the scene last? Or did they leave together?

A. I'm not sure.

Q. All right. So, now, were you physically injured at all as a result of this incident?

A. No. Just my wrist hurt. That was it.

Q. Okay. Any marks on your wrists or anything?

A. Probably like lines. They didn't last very long, but --

Q. Okay. So did you go for any medical treatment?

A. No.

Q. Okay. And so after -- at some point all the cops leave. What happens next?

A. My mother ended up meeting my father at the police station, I believe.

Q. Did you go with her?

A. No.

Q. Okay. So when is the next time you saw your father?

A. Probably a couple hours after that, I believe.

51

Q. Was that at home?

A. Yes. I think so.

Q. Okay. Did you have any conversation at that point with your father about what happened?

A. Yes.

Q. What was the conversation? What was the gist of it?

A. He -- I believe he said he was going to sue them, they had no right to pull us over. Sort of things like that. I'm not so sure the whole conversation.

Q. Okay. What ended up happening with your ticket?

A. It got dismissed.

Q. Okay. Did you go to court?

A. Yes.

Q. How many times?

A. One.

Q. And did you have a lawyer?

A. No.

Q. When you went to court the one time, what took place? Did you have to meet with a prosecutor? Did you just go into the courtroom?

A. No. It just the judge and I believe others in

52

the courtroom. It wasn't -- it was like a group courtroom, and they were literally just going by traffic tickets, just going and dismissing or giving them a fine or whatever.

Q. So, I mean, did you have to tell the judge your side of the story?

A. No.

Q. Did they -- did they fine you or just dismissed it?

A. Just dismissed it.

Q. Did they tell you why it was being dismissed?

A. No.

Q. Was your father's -- was he charged with something?

A. I'm not sure.

Q. Okay. Was he in court with you that day?

A. Yes.

Q. Were his charges dismissed?

A. He didn't have a -- it wasn't for him. It was only for me.

Q. Oh, just for you.

A. Yeah.

Q. Okay. Did you ever find out what happened to his

53

charges?

A. No.

Q. Okay. Did your dad ever tell you why he thought the troopers were doing this?

A. Honestly, we both had our ideas. I mean, my father just got out of jail, so that's another thing. He also told me that they had road blocks around the corner just in case we would escape.

Q. You mean at the time of this incident?

A. Yes.

Q. Who told you -- who told him that? Do you know?

A. I'm not sure. Probably the police officer.

Q. Okay. So you don't know if that was accurate or not?

A. No.

Q. All right. So did you see your dad when he came home?

A. Yes.

Q. All right. And when did you go back to school?

A. Most -- probably that same day. Most likely that same day.

Q. Okay. And you sent me via text message like three short videos and then a couple longer ones,

54

correct?

A. Yes.

Q. All right. Have you viewed those videos?

A. Not recently, no.

Q. Okay. As far as you know, do the videos -- if you know. If you don't know, just say so. Do those videos show your father's face being smushed against the back window?

A. Yes. I'm pretty sure.

Q. Okay. And was that -- at the time your father was pulled out of the car and then handcuffed, were you using his phone to tape what occurred?

A. Yes.

Q. All right. At any point were you taping anything with your phone?

A. No.

Q. Either audio or visual?

A. No.

Q. And I think you said that there was some conversation about getting your phone out of the car?

A. Yes.

Q. All right. What did that have to do with?

55

A. Calling my mother. She was at work at the time, and she was the only person that I knew that I could call. So one of the neighbors was trying to get my phone so I could call her, but somebody else end up calling my mother.

Q. Who was watching your siblings at the house?

A. I believe it was either my brother -- yeah, I think it was my brother.

Q. Your twin brother?

A. Yeah.

Q. Did you see him come out of the house at all?

A. I don't think so, no.

Q. Okay. Did you ever talk to him as to whether he called your mother?

A. No.

Q. You didn't talk to him about that?

A. No. She just showed up. It was a lot going on that day.

Q. I understand. I'm just trying to understand what the whole deal was with your phone, why that was such a big deal.

A. I don't understand why it was a big deal, but I was in handcuffs, so I couldn't understand why

56

they thought that I couldn't get my phone. Or it was either they thought I was trying to grab something other than my phone out the car. But one of the neighbors end up getting my phone out the car. I'm not so sure why it was a big deal, buy, hey, it turned into a big deal.

Q. Okay. So at some point -- I'm -- maybe I missed something. Were you trying to get your phone out of the car?

A. Yes, I was.

Q. And when were you doing that?

A. This was when my neighbor asked me for my phone to call my mother. I told her it was in the car, and I was literally moving, like shifting to the car.

Q. This was after you were already handcuffed?

A. Yes.

Q. Okay. And while you were handcuffed, where did they have you standing?

A. It was kind of in the middle, like in between my mother's car and the police car.

Q. The car they ultimately put you in?

A. Yes.

57

Q. And who was -- was there an officer standing there with you?

A. Yes. I believe so.

Q. Okay. Was it the male and female officers?

A. It was the female officer.

Q. Okay.

A. She was the closest to me at that point.

Q. While she was standing there, did she have hands on you or was she just standing next to you?

A. She was just standing there.

Q. And then at some point you started to move towards the car when you were cuffed?

A. Yes.

Q. And what happened then?

A. She just -- one of them grabbed me and end up putting me in the police car.

Q. So you were standing -- it was only --

A. Somebody called my mother while I was in the police car.

Q. So you weren't put in a police car until you had started to move towards the car to get your phone?

A. Yes.

58

Q. Okay. And at that point were you telling the person that was there that your phone was in the car?

A. Yes.

Q. Okay. And so before you were put in the police car, you were basically just standing there kind of watching what was going on?

A. Yes.

Q. And then after you tried to make a move towards your car is when they put you in the police car?

A. Yes.

Q. All right. And was there any conversation going on between you and this female officer during this time?

A. No. I don't think so.

Q. Okay.

A. I did record her badge number, though, I believe.

Q. Okay. And why did you do that?

A. Just in case anything went wrong.

Q. Well, did anything go wrong from your -- to you?

A. Not really, no.

Q. Okay. What, if anything, do you think the cops did wrong with respect to you that day?

59

A. Lying.

Q. Okay. The trooper?

A. Yes.

Q. What about the Niagara Falls cops?

A. Honestly, the cuffs were just too tight.

Q. But you understood why they stopped you from getting involved with your dad?

A. Yes.

Q. Okay. Did you ever tell them the cuffs were too tight?

A. Yes.

Q. Who did you tell?

A. The lady --

Q. And what --

A. -- and the man.

Q. And what, if anything, did they say?

A. Nothing.

Q. Okay. How many times did you tell them?

A. Couple times actually.

Q. Okay. By the time the cuffs were removed, were your hands swollen at all?

A. No.

Q. Did you still have feeling in your fingers?

60

A. Yes.

MR. BOND: All right. Let me do this real quick. Let's see if I can access the videos real fast and I can just have you identify them.

Off the record.

(Discussion off the record.)

BY MR. BOND:

Q. So you -- when I talked to your dad, I had asked him -- he showed me some videos from the Ring camera at your house as well as other video footage, telephone footage. And I asked him to provide it to me, and I guess he sent the stuff to you to send to me.

A. Yes.

Q. And today you sent me via text message, it looked like it was eleven short videos and then three longer ones.

A. Yes.

Q. All right. And all the videos that you provided to me today, were those all provided to you by your dad?

A. Yes.

Q. Okay. And other than those videos, do you know

61

of any other videos that exist?

A. No.

Q. Okay. Were there other -- your dad ultimately was arrested that day it's your understanding?

A. Yes.

Q. Were there two other people arrested as well that you know?

A. I think so, yes.

Q. Okay. Do you know who they were?

A. Two females, most likely. My neighbors. They lived at the end of the street.

Q. Okay. Were you able to -- did you see them getting arrested at all?

A. I seen one get put in handcuffs. The other one I'm not so sure about.

Q. And then your dad, he filed this document called Notice of Claim or a Notice of Intention. Have you ever seen this, this three-page document?

A. No. No, I never seen this document.

Q. Okay. Did your dad tell you he was filing some document so that you could bring a lawsuit?

A. Yes.

Q. Okay. And did you discuss that with him?

62

A. Yes.

Q. And did you agree that he should do that on your behalf?

A. Yes.

Q. Okay. And who did you ask him to put on notice of your intention to sue?

A. I told him whatever was best for it, because there was literally a lot going on, and he knows the system more than I do.

Q. All right. Do you know what a strip -- a spike strip is?

A. To pop tires. Right?

Q. Yeah. Was there anything like that used to stop your car that day?

A. No.

Q. Did you see anyone put one down during this incident?

A. No.

Q. All right. In here it says that the police arrested you. Were you arrested that day?

A. No, I was not arrested.

Q. Okay. It says they took you out of the car. Did they take you out of the car that day?

63

A. No.

Q. Okay. They handcuffed you?

A. Yes.

Q. Okay. Did they issue you an appearance ticket?

A. Yes.

Q. All right. You're talking about the traffic ticket?

A. Yes.

Q. Okay. Any other ticket?

A. No.

Q. All right. And the appearance ticket was issued by the state trooper? Or, the traffic ticket?

A. Yes.

MR. BOND: All right. I think we're all set. Thank you so much for taking the time to come down. I appreciate it.

THE WITNESS: You're welcome. Thank you.

.    .    .    .    .

64

STATE OF NEW YORK)
        SS:
COUNTY OF NIAGARA)

I, Valerie A. Rosati, a Notary Public in and for the State of New York, County of Niagara, DO HEREBY CERTIFY that the testimony of LAWTORYA JOHNSON was taken down by me in a verbatim manner by means of Machine Shorthand, on June 3, 2025. That the testimony was then reduced into writing under my direction. That the testimony was taken to be used in the above-entitled action. That the said deponent, before examination, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth, relative to said action.

I further CERTIFY that the above-described transcript constitutes a true and accurate and complete transcript of the testimony.

_____
VALERIE A. ROSATI,
Notary Public.



# WALSH ROBERTS & GRACE LLP

### ATTORNEYS AT LAW

MARK P. DELLA POSTA
KEITH N. BOND
ROBERT P. GOODWIN
JOSEPH J. XXXXXXXXXXXR.
DILLON MESI

GERALD GRACE, JR. OF COUNSEL
JAMES R. WALSH 1937-2021
THOMAS E. ROBERTS, RETIRED

September 17, 2025

Mr. Victor E. Johnson
924 Fairfield Avenue
Niagara Falls, New York 14305-2441

> Re:  Johnson vs. City of Niagara Falls
>       Our File No. 9095

-------------------------------------------------------

Dear Mr. Johnson:

Pursuant to your request, enclosed please find a copy of your 50-h testimony and the 50-h testimony of your daughter, Lawtorya Johnson.

Very truly yours,

KEITH N. BOND

KNB/tl
enclosures

400 RAND BUILDING • 14 LAFAYETTE SQUARE • BUFFALO, NY 14203-1904
(716) 856-1636 • NIAGARA FALLS: (716) 284-0133
FAX: (716) 856-1610 (NOT FOR SERVICE)
WWW.WALSHROBERTSGRACE.COM

26 CV 825

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Victor Johnson
Lautorya Johnson

## DEFENDANTS
Trooper Shawek, Curran II
Lt. John Doe, Jane Doe NYS Police
Niagara Falls Police officers

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☒ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### INTELLECTUAL PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983

Brief description of cause:
False Arrest, Malicious Prosecution, Illegal Search, Excessive Force

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____
DOCKET NUMBER 18-CV-1152, 1:21-cv.

DATE _____

SIGNATURE OF ATTORNEY OF RECORD

OC606

### FOR OFFICE USE ONLY
RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____




**Retail**

UNITED STATES
POSTAL SERVICE ®

14202

**RDC 99**

U.S. POSTAGE PAID
FCM LG ENV
NIAGARA FALLS, NY 14301
APR 20, 2026

**$3.84**

S2324N507105-17

STATES DISTRICT COURT

N DISTRICT OF NEW YORK

AGARA SQUARE

FAW, NEW YORK 14202

VICTOR E. JOHNSON, SR.

924 Fairfield Ave

NIAGARA FALLS, NEW YORK 14305

USDC - WDNY

APR 2 3 2026

BUFFALO

To: UNITE

WESTE

2 N

BUF